**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| UNICORN ENERGY GMBH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil No. 2:20-cv-00338 |
| | ) | |
| TESLA, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

## DEFENDANT TESLA, INC.'S RESPONSIVE CLAIM CONSTRUCTION BRIEF

**TABLE OF CONTENTS**

**Page**

I.      INTRODUCTION ........................................................................................ 1

II.     BACKGROUND OF THE '869 PATENT ................................................... 2

III.    LEGAL STANDARDS ............................................................................... 3

IV.     DISPUTED TERMS ................................................................................... 5

    A.      "Contact Unit for Contacting a Further Energy Storing Component" .................. 5

        1.      "Contacting" / "Contacting a Further Energy Storing Component" .......... 5

        2.      "Contact Unit for Contacting a Further Energy Storing Component" Invokes § 112 ¶ 6 ........................................ 7

        3.      Alternatively, "Contact Unit" Should be Construed According to the Specification .......................................... 11

    B.      "Gateway for Coupling the At Least One Contact Unit with the Energy Store" Is Indefinite ............................................... 12

        1.      Alternatively, "Gateway" Should Be Construed to Mean "A Single Part that Serves as a Point of Entry and Exit to Another System" .......... 14

    C.      "Energy Storing Component," "Energy Store," "Functional Group," and "Supply Network Component" Are Indefinite .................................... 15

    D.      "Supply Network" Is Indefinite ............................................................. 19

        1.      Alternatively, the Term Should Be Construed: "A Distributed Network that Includes Physically Contacting Energy Storing Components" ............................................................. 20

    E.      "Transport Interface," "Communication Interface," and "Auxiliary Voltage Interface" Invoke § 112 ¶ 6 ..................................... 22

        1.      "Transport Interface" Should Be Construed to Have a Function of "Transmitting the Electrical Energy to the Further Energy Storing Component" and a Structure of "A Rotationally Symmetrical Structure Designed in a Coaxial Fashion with Respect to an Auxiliary Voltage Interface, Consisting of either Spring Contact Pins or Two Ring-Shaped, Coaxial Contacts—One for Ground and Potentially Comprising Insulating Webs, as Described in the Specification, and Equivalents Thereof" .................................... 23

        2.      "Communication Interface" Should Be Construed to Have a Function of "Exchanging Information With a Further Energy Storing Component Capable of Understanding the Information" and a Structure of "An RFID Transponder for Transmitting and Receiving all Required Technical Data and Physical Parameters Between Energy Storing Components, and Equivalents Thereof" .......... 25

## TABLE OF CONTENTS
(continued)

Page

3. "Auxiliary Voltage Interface" Should Be Construed to Have a Function of "Transmitting Auxiliary Voltage for Supplying at Least One of the Contact Unit or the Gateway with Electrical Energy" and a Structure of "A Rotationally Symmetrical Structure Designe in a Coaxial Fashion with Respect to the Transport Interface in the Form of Either a Centrally-Formed Spring Contact or a Mating Contact" ........................................................................ 27

F. "Network Medium" Means "Electrical Energy in a Distributed Network" ........ 28

G. "Configured to Cooperate with the Communication Interface" Is Indefinite ...... 28

1. Alternatively, the Term Should Be Construed: "Configured to Work Together with the Communication Interface" .............................. 29

H. The Terms "An Autonomous Identification of Incompatibility [/ Compatibility]" Are Indefinite ......................................................... 29

1. Alternatively, the Terms Should Be Construed: "An Identification, by the Energy Storing Component, of Incompatibility [/ Compatibility] with the Supply Network" .......................................... 30

I. "Controlling Device" Requires No Construction ................................................ 30

V. CONCLUSION .................................................................................................................... 30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arbmetrics, LLC v. Dexcom, Inc.*,
   No. 18-CV-134 JLS (KSC), 2019 WL 7290541 (S.D. Cal. Dec. 30, 2019),
   *aff'd*, 2020 WL 7828744 (Fed. Cir. Dec. 31, 2020) .................................................5

*Asyst Techs., Inc. v. Empak, Inc.*,
   268 F.3d 1364 (Fed. Cir. 2001) .............................................................23

*B. Braun Med., Inc. v. Abbott Lab'ys*,
   124 F.3d 1419 (Fed. Cir. 1997) (structure must be clearly linked to the
   function recited in the claim.") ........................................................24, 27

*Bicon, Inc. v. The Straumann Co.*,
   441 F.3d 945 (Fed. Cir. 2006) .................................................................1

*Canon, Inc. v. TCL Elecs. Holdings Ltd.*,
   No. 2:18-CV-546-JRG, 2020 WL 2098197 (E.D. Tex. May 1, 2020) ........................... *passim*

*Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*,
   677 F.3d 1361 (Fed. Cir. 2012) ...........................................................2, 18

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
   750 F.3d 1304 (Fed. Cir. 2014) ..............................................................13

*Genband USA LLC v. Metaswitch Networks Ltd.*,
   No. 2:14-CV-33-JRG-RSP, 2015 WL 4722185 (E.D. Tex. Aug. 7, 2015) ........................22

*Goldenberg v. Cytogen, Inc.*,
   373 F.3d 1158 (Fed. Cir. 2004) ............................................................1, 3

*Halliburton Energy Servs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) ............................................................4, 5

*Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*,
   493 F.3d 1358 (Fed. Cir. 2007) ..............................................................12

*Indacon, Inc. v. Facebook, Inc.*,
   824 F.3d 1352 (Fed. Cir. 2016) .......................................................... *passim*

*Iridescent Networks, Inc. v. AT&T Mobility, LLC*,
   933 F.3d 1345 (Fed. Cir. 2019) ..............................................................15

*In re: LF Centennial Ltd.*,
   654 F. App'x 491 (Fed. Cir. 2016) ...........................................................28

# TABLE OF AUTHORITIES

(cont'd.)

*MTD Prods. Inc. v. Iancu,*
  933 F.3d 1336 (Fed. Cir. 2019)......................................................................9

*Nautilus Inc. v. Biosig Instruments, Inc.,*
  572 U.S. 898 (2014)....................................................................................4

*Nautilus, Inc. v. Biosig Instruments, Inc.,*
  134 S. Ct. 2120 (2014)................................................................................16

*Netcraft Corp. v. eBay, Inc.,*
  549 F.3d 1394 (Fed. Cir. 2008) ...................................................................22

*Novo Indus., L.P. v. Micro Molds Corp.,*
  350 F.3d 1348 (Fed. Cir. 2003)....................................................................19

*Omega Eng'g, Inc, v. Raytek Corp.,*
  334 F.3d 1314 (Fed. Cir. 2003)....................................................................22

*Phillips v. AWH Corp.,*
  415 F.3d 1303 (Fed. Cir. 2005).....................................................................3

*Power Mosfet Techs., L.L.C. v. Siemens AG,*
  378 F.3d 1396 (Fed. Cir. 2004)......................................................................5

*Quest Licensing Corp. v. Bloomberg L.P.,*
  C.A. No. 1:14-561-GMS-LPS, D.I. 138 (D. Del. Mar. 11, 2016) (Ex. 17) ............................22

*Sas Inst. Inc. v. World Programming Ltd.,*
  No. 2:18-CV-295-JRG, 2020 WL 569856 (E.D. Tex. Feb. 5, 2020) .......................................3

*Thorner v. Sony Computer Ent. Am. LLC,*
  669 F.3d 1362 (Fed. Cir. 2012)....................................................................30

*TriMed, Inc. v. Stryker Corp.,*
  514 F.3d 1256 (Fed. Cir. 2008)............................................................ *passim*

*Vitronics Corporation v. Conceptronic, Inc.,*
  90 F.3d 1576 (Fed. Cir. 1996)......................................................................4

*Williamson v. Citrix Online, LLC,*
  792 F.3d 1339 (Fed. Cir. 2015)............................................................ *passim*

**Statutes**

35 U.S.C. § 112.................................................................................... *passim*

## I.    INTRODUCTION

The asserted claims of U.S. Patent No. 10,008,869 ("'869") (Keefe Decl. Ex. 3) contain numerous coined terms that have no plain and ordinary meaning.  Unicorn's proposals are clearly intended to capitalize on the ambiguity of these terms to distort its claims to a scope that was never contemplated.  Unicorn does not dispute that the numerous coined terms have no recognized plain and ordinary meaning to a person of ordinary skill in the art ("POSA").  As such, the terms are either indefinite or must be limited to their structural descriptions, if any, in the specification under 35 U.S.C. § 112 ¶ 6, and the Federal Circuit's *Williamson* decision, or the Federal Circuit's *Indacon* decision.  Unicorn's proposals ignore these principles by taking individual terms out of context to impermissibly eliminate express limitations through overly broad proposals.

In a stark example of trying to rewrite the claims to ignore limitations, Unicorn proposes a construction for "contact unit for contacting a further energy store" that would impermissibly "render certain language in the claims meaningless."  *See, e.g.*, *Bicon, Inc. v. The Straumann Co.*, 441 F.3d 945, 951 (Fed. Cir. 2006).  Despite the fact that the undisputed plain and ordinary meaning of "contacting" in the electrical arts requiring "touch[ing]," Unicorn seeks to rewrite the limitation to merely require "transmitting," which requires no touching at all.  But meaning must be given to the expressly recited terms chosen by the patentee.

Unicorn also violates the canon that claims with no plain and ordinary meaning must be construed in accordance with the intrinsic evidence.  *Goldenberg v. Cytogen, Inc.*, 373 F.3d 1158, 1164 (Fed. Cir. 2004).  For example, Unicorn relies on the lack of meaning of "gateway"/"coupling unit" within the art to propose a construction that contradicts the express teachings in the specification.    According to the patent, only the red boxes, below, are "coupling unit[s]"/"gateway[s]" "18."  *See* Figs. 1, 9 (below); '869, 13:61-67.  But Unicorn ignores this

1

disclosure and proposes a construction based on its new, and completely unsupported, gerrymandering of Fig. 9 to associate unrelated components with a "gateway"/"coupling unit."



Unicorn also violates the canon that different claim terms are presumed to have different meanings. *See, e.g.*, *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012). Under Unicorn's proposals, ***"supply network component," "energy store," "energy storing component," and "functional group"—all mean the same thing***. The ambiguity of these different coined terms, as described in the specification and which Unicorn's proposed constructions cannot cure, demonstrates the indefiniteness of the claims.

## II.    BACKGROUND OF THE '869 PATENT

The original claims of the '869 recited a "supply network component" for a "supply network" that comprised "at least one contact unit for contacting a further supply network component," a "functional group having at least one functional unit," and "at least one coupling unit for coupling the at least one contact unit to the functional group." Ex. 1 at 37-40. The claimed "contact unit" was described as having "a communication interface for communicating with a further supply network component" and a "transport interface for transporting the network medium

to a further supply network component." *Id.*

Unicorn was forced to significantly narrow the scope of the claims during prosecution to overcome prior art rejections. The claims were amended to replace most instances of "supply network component" with "energy storing component" ("ESC"), most instances of "functional group" with "energy store," and "coupling unit" with "gateway." Ex. 2 at 2-7. The claims were also amended to specify that the "network medium" is "electrical energy" and that ESCs must be able to autonomously connect to and determine compatibility with the "supply network." *Id.*

Unicorn's description of the '869 and the state of the art at the time of the alleged invention is largely inaccurate. *See* Ehsani ¶¶ 32-36; Open. Br. at 1-4. For example, Unicorn's statements about prior art battery packs are incorrect—prior art energy storage systems, such as Ex. 4, U.S. Patent App. Pub. No. 2011/0006603 to Robinson, et al., ***could*** detect physical parameters of external components and decide on their own whether to connect to a network (based on compatibility with the network). Ehsani ¶¶ 34-35; Open. Br. at 2-3. Contrary to Unicorn's assertions, the '869 did not solve any "problem"—every alleged "problem" in the art discussed by Unicorn was already addressed by prior art systems such as Robinson's. Ehsani ¶¶ 34-35.

## III.    LEGAL STANDARDS

Claim terms are generally given their ordinary and customary meaning to a person of ordinary skill in the art. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1311-13 (Fed. Cir. 2005). However, "[w]here a claim term has no ordinary and customary meaning, a court must resort to the remaining intrinsic evidence . . . to obtain the meaning of that term." *Goldenberg*, 373 F.3d at 1164; *see also Sas Inst. Inc. v. World Programming Ltd.,* No. 2:18-CV-295-JRG, 2020 WL 569856, at *7 (E.D. Tex. Feb. 5, 2020) (for "terms [that] do not themselves have any well-established meaning in the relevant art," the disclosures in the specification "should be given effect

in the Court's constructions").  If a term is still ambiguous after reviewing the intrinsic evidence, extrinsic evidence such as dictionary definitions, expert testimony, and other references may be considered.  *See Vitronics Corporation v. Conceptronic, Inc.*, 90 F.3d 1576, 1583 (Fed. Cir. 1996).

An element in a claim may be expressed as a means for performing a specified function without reciting structure in support thereof, but such claim shall be construed to cover the corresponding structure described in the specification and equivalents thereof.  35 U.S.C. § 112 ¶ 6.  Although there is a rebuttable presumption that a term without "means" does not invoke § 112 ¶ 6, a term that merely replaces "means" with a nonce term like "unit" or "interface" invokes § 112 ¶ 6 when recited "in traditional means-plus-function" format.  *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1350 (Fed. Cir. 2015).  Construction of such term involves two steps: (1) identifying the claimed function(s) and (2) determining the corresponding structure(s), if any, in the specification clearly linked to the claimed function(s).  *Id.* at 1351-52.  If no corresponding structure is found, the means-plus-function term is invalid as indefinite.  *Id.* at 1352; *TriMed, Inc. v. Stryker Corp.*, 514 F.3d 1256, 1259-60 (Fed. Cir. 2008).  Even when § 112 ¶ 6 is not invoked, a term with "no accepted meaning in the art" "cannot be construed broader than the disclosure in the specification."  *Indacon, Inc. v. Facebook, Inc.*, 824 F.3d 1352, 1357 (Fed. Cir. 2016).

Patent claims must particularly point out and distinctly claim the subject matter regarded as the invention.  35 U.S.C. § 112 ¶ 2.  When, as here, the claims do not "inform those skilled in the art about the scope of the invention with reasonable certainty," the claims are invalid for indefiniteness.  *Nautilus Inc. v. Biosig Instruments, Inc.*, 572 U.S. 898, 910 (2014).  "Even if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope."  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008).

4

## IV.    DISPUTED TERMS

### A.    "Contact Unit for Contacting a Further Energy Storing Component"

#### 1.    "Contacting" / "Contacting a Further Energy Storing Component"

A person of ordinary skill in the art would have understood the term "contacting" to refer to its plain and ordinary meaning in the art, which is "physically touching in order to establish an electrical junction."  Ehsani ¶¶ 49-54.  This plain and ordinary meaning is consistent with the lay definition of "contacting" (i.e., physically touching) and the recognition within the art, as reflected in dictionary definitions, that "contact" involves the formation of an electrical junction.  *See id.*; Ex. 5 ("contacting": "to put or bring into contact"; contact: "the act or state of ***touching***"); Ex. 6 at 141 ("contact": "The coming together, ***touching***, union, or ***junction*** of surfaces or objects."); Ex. 7 ("contact": "union or junction of surfaces . . . the ***junction*** of two electrical conductors through which a current passes").  *See Arbmetrics, LLC v. Dexcom, Inc.*, No. 18-CV-134 JLS (KSC), 2019 WL 7290541, at \*\*6-7 (S.D. Cal. Dec. 30, 2019), *aff'd*, 2020 WL 7828744 (Fed. Cir. Dec. 31, 2020) (finding that "'in contact with' means 'touching'" and noting that "all of the dictionaries cited by Plaintiff include a definition consistent with the plain meaning, touching"); *Power Mosfet Techs., L.L.C. v. Siemens AG*, 378 F.3d 1396, 1410 (Fed. Cir. 2004) (holding that "contact" requires formation of a "physical boundary").  Unicorn itself quotes a dictionary definition that defines "contact" as "provid[ing] an electrical path when it ***touches*** another conductor," which mirrors Tesla's proposed construction of "physically touching in order to establish an electrical junction."  Open. Br. at 13.

Each of the asserted claims requires "at least one contact unit for ***contacting a further energy storing component*** of the supply network."  Consistent with the plain and ordinary meaning of "contacting," the proper construction of "contacting a further energy storing component" is "physically touching a further energy storing component to establish an electrical

junction." Ehsani ¶ 49. During prosecution, the applicant confirmed that it was using "contact" in conformance with Tesla's proposed construction by stating: "***This type of contact configuration is similar to that used with a standard AA or D cell battery***, and is clearly not 'independent' or 'distinct' from the other embodiments of the application." Ex. 8 at 1. A POSA would have understood that the "contact configuration" of a "standard AA or D cell battery" requires physical touching in order to establish an electrical junction between battery contacts. Ehsani ¶ 52; '869 patent at 11:10-13 ("***In a manner similar to a cylindrical alkaline battery,*** <u>***contact***</u> ***is made by two contact units at two cylinder ends,*** the base surface and the top surface of the cylinder."); *see also* Figs. 2-8 (depicting cylindrical embodiments reminiscent of standard AA or D cell batteries). The concept of contacting (i.e., physically touching) the leads of AA or D cell batteries together to form an electrical junction is well-understood even to a lay person. *Id.*

Despite this clear record, Unicorn asserts that "contacting" should be construed as "transmitting electrical energy and/or information from or to." Open. Br. at 13. This construction must be rejected because it improperly redefines "contacting" away from its ordinary meaning, and eliminates the concept of "contacting" altogether. In point of fact, while two components that are "contacting" each other ***could*** potentially transmit electrical energy and/or information between themselves, components that are merely "transmitting" electrical energy and/or information between themselves need not necessarily be "contacting" each other. Ehsani ¶ 53.

Unicorn has identified nothing in the intrinsic record to justify a construction that would result in the claim language of "***contacting*** a further energy storing component" being satisfied without actually "***contacting*** a further energy storing component." To the contrary, Unicorn's expert states that the "contact unit" described in the specification is for "making electrical contact with further devices." Ex. 9 ¶ 85. Under the claims' recited language, the "further device" here

is "a further energy storing component," and making electrical contact with a further energy storing component must be accomplished via physical touching of the further ESC to establish an electrical junction, as reflected in Tesla's proposed construction.  Ehsani ¶¶ 49-54.

### 2.    "Contact Unit for Contacting a Further Energy Storing Component" Invokes § 112 ¶ 6

The term "contact unit for contacting a further energy storing component" invokes § 112 ¶ 6 under *Williamson* and this Court's prior cases because  "contact unit" does not have any definite structural meaning in the art and the term is recited in means-plus-function format using a nonce word ("contact ***unit***") followed by its function ("for contacting a further energy storing component"), without reciting definite structure in the claims.  Ehsani ¶¶ 55-60.

The term "contact unit" would not have been understood by a POSA to have sufficiently definite meaning as the name for structure.  Rather, "contact unit" has been used in multiple ways within the relevant art to describe a wide variety of different structures designed for a wide variety of purposes.  *See, e.g.*, Ex. 10, 3:51-64, Figs. 1-2 (describing a "contact unit" mounted on a sliding door frame and another "contact unit" mounted on a door jamb that, when disconnected, indicate the door is open); Ex. 11 ¶¶ 27-30, Figs. 1-3 (disclosing two "contact unit[s]," each comprising two contacts that, when opened and closed, may be used to "control the rotation speed" of an "armature"); Ex. 12, 5:54-61, Fig. 9 (describing a "contact unit" that includes a variety of components, including "a ring-shaped stator 51, a rotor 52," and power terminals, one of which "outputs" "supply power" to an "ECU"); Ehsani ¶ 57.  Thus, within the art, a "contact unit" has been variously described as including (1) a set of contacts for mating with a ***different*** "contact unit"; (2) two sets of contacts comprising ***a single*** "contact unit; or (3) a wide variety of components, most of which have nothing to do with forming an electrical contact.  *Id.*

This disparity in usage of the phrase "contact unit" demonstrates, contrary to Unicorn's

assertion, that the mere presence of the word "contact" does not connote definite structure for the recited "contact unit."[1]  *See* Open. Br. at 12.  Unicorn has not identified any dictionary definitions or other evidence purporting to describe or define the term "contact unit" as a definition of known structure within the art.  *See* Ehsani ¶ 55 ("The term 'contact unit' is not and would not have been found in dictionaries, textbooks, treatises, etc., for example, as it is not a term of art used in common parlance in the relevant technical field.").  *Cf. Canon, Inc. v. TCL Elecs. Holdings Ltd.*, No. 2:18-CV-546-JRG, 2020 WL 2098197, at *15 (E.D. Tex. May 1, 2020).

Furthermore, the word "'unit' is a nonce term," and this Court has previously held that terms such as "connection unit" and "communication unit," similar to "contact unit" here, invoked § 112 ¶ 6.  *Id.* at *25 (quoting *Williamson*, 792 F.3d at 1350 (en banc)).  Unicorn's own arguments support the conclusion that "contact unit" invokes means-plus-function format.  Specifically, Unicorn contends that a POSA would understand "contact" to mean "connector."  Open. Br. at 12, 13.  This would construe the term "contact unit" as "connector unit," which is akin to *Canon*'s "connection unit" term that invoked § 112 ¶ 6.

Unicorn further attempts to impart structure onto the claimed "contact unit" by arguing that a POSA would understand the structure of a "contact unit" "from the descriptions in the specification."[2]  Open. Br. at 13.  But it is the descriptions of "contact unit" ***in the claims*** that matter for determining whether § 112 ¶ 6 applies.  *TriMed*, 514 F.3d at 1259-60; *Williamson*, 792 F.3d at 1349 ("The standard is whether ***the words of the claim*** are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure.").

_____

[1] The lack of any definite structure associated with a "contact unit" is further shown by the figures within the patent that depict contact units as literal black boxes without identifying any actual structure (labeled "12" and "14" in Figure 1 and "K1" and "K2" in Figure 10).  Ehsani ¶ 58.

[2] Unicorn has not identified any express lexicography of a structural definition for "contact unit" in the specification.

Moreover, even if the specification supported Unicorn's proposed construction (which it does not), it would not be enough to impart structure under this Court's reasoning in *Canon*: "That the patent specification discloses an example of a communication unit or a connection unit in the specification (such as a USB connector or a USB host controller) does not by itself impart structural significance to the nonce 'unit' terms."). 2020 WL 2098197 at *25-26. When, as here, "the surrounding claim language simply recites the intended function of the term," the term invokes § 112 ¶ 6. *Id.*; *MTD Prods. Inc. v. Iancu*, 933 F.3d 1336, 1344 (Fed. Cir. 2019) ("That the specification discloses a structure corresponding to an asserted means-plus-function claim term does not necessarily mean that the claim term is understood by persons of ordinary skill in the art[.]").

Having invoked § 112 ¶ 6, a POSA would have identified the claimed function of "contact unit for contacting a further energy storing component" as "physically touching a further energy storing component to establish an electrical junction." Ehsani ¶ 61. The corresponding structures that are clearly linked to performing this claimed function are: "(1) the socket or the plug contact units 12 and 14, respectively, that implement the standard interfaces 34, 36, 38 illustrated in Figs. 7 and 8 for contacting a further contact unit, and (2) the single exterior contact units that physically touch other energy storing components, shown and described in Figs. 1, 2, 3, 4, 6b, 7, 8, 10, and 11 and relevant portions of the specification, and equivalents thereof." Ehsani ¶¶ 62-63.

Tesla's proposed structures include all structure corresponding to contact units ***for contacting*** a further ESC. Ehsani ¶¶ 62-66. Unicorn argues that, in addition to Tesla's structures, the structure should also include things that do not touch:

> From the corner data mentioned above, it is possible to define a design for a supply network component in which the energy stores, the energy sources and the energy consumers are then optionally combined among one another by plugs and ***cables*** but also by individual contact units being simply plugged together. . . .

> Furthermore, both in the case of the first contact unit 12 and in the case of the second contact unit 14 it can be provided that they are provided with ***cables*** in order, besides the standard interfaces 34, 36, 38 illustrated in FIGS. 7 and 8, to provide a connection to other functional groups, for example energy sources or energy stores according to other standards, for instance automobile batteries.

Open. Br. at 14; '869 patent at 11:16-24, 17:59-65.

But a POSA would ***not*** have associated this potential use of a "cable" as structure clearly linked to the "contact unit for contacting a further energy storing component." Ehsani ¶¶ 63-66. The claimed function requires the "contact unit" to perform the function of "contacting [i.e., physically touching] a further energy storing component." A cable plugged into the contact unit would only result in the "contact unit" contacting the cable, not the further ESC. Furthermore, a POSA would understand that the cables "provide a connection to other functional groups, for example energy sources or energy stores according to other standards, for instance automobile batteries" and that the cable connections are in addition to separate connections involving "contact units being simply plugged together." Ehsani ¶ 64. A POSA would thus understand that the cables are used for establishing connections with components that are ***not*** connected via contact units. *Id.* The patent does not describe any embodiment in which a contact unit at the end of a cable is used to contact an energy storing component. *Id.*

The above excerpt also states that the cables are used "***besides*** the standard interfaces 34, 36, 38 illustrated in FIGS. 7 and 8" (i.e., the "interfaces" associated with the claimed contact units). The cables are therefore used "in addition to" the "standard interfaces" for contacting further energy storing components and do not replace them. *See* Ex. 13, Cambridge Online Dictionary ("besides": "in addition to; also"); Ehsani ¶ 65. The cables' "connection to other functional groups" such as "automobile batteries" would not be capable of implementing the claimed "communication interface for communicating with a further energy storing component" included

10

in every "contact unit," given that communication with non-"standard" energy storage devices like "automobile batteries" would generally be impossible.  *Id.* ¶ 66.  A POSA would also understand that the "cables" are for connections based on "*other standards*, for instance automobile batteries" that cannot be connected using the claimed contact units (i.e., standards other than the standard that governs how contact units contact each other).  *Id.* ¶ 64.

### 3.    Alternatively, "Contact Unit" Should be Construed According to the Specification

Because "contact unit" is a coined term, it must be limited to its descriptions in the intrinsic record if it is held to not invoke § 112 ¶ 6.  *Indacon*, 824 F.3d at 1357.  These descriptions are reflected in Tesla's alternative construction: "a single part on the exterior surface with at least one contact."  Ehsani ¶¶ 67-70.  The '869 discloses "contact unit" as a single structure with constituent subparts, such as spring contacts.  *E.g.*, '869, 16:1-2.  It never describes a contact unit that comprises multiple, separate parts, such as a "group" of separate and distinct plugs or sockets.  *See* Open. Br. at 15 n.5.  Rather, all of the interfaces—transport, communication, auxiliary—are disclosed as being part of a single "contact unit."[3]  *See* '869, claims 1, 3, 27.  Even exploded views of embodiments in the figures, such as Fig. 4, show each contact unit as a single part (e.g., items "12" and "14").  Also, every contact unit in the patent is on the exterior surface of an ESC, in order to "contact" (physically touch) another ESC.  *Id.* ¶ 70.  Contrary to Unicorn's vague assertion that a "contact unit could be at the end of a cable," the patent does not describe any embodiment in

---

[3] A POSA would understand that "unit" in "contact unit" refers to a "single" or "unitary" part, as in the specification's embodiments.  Ehsani ¶ 70.  If Unicorn contends otherwise, such an interpretation would be indefinite because a POSA would not be able to ascertain what constitutes a single "contact unit" from multiple "contact units."  For example, a POSA cannot reasonably distinguish between a single "contact unit" having a "communication interface," a "transport interface," and an "auxiliary voltage interface" from three distinct "contact units" where, for example, a first "contact unit" has a "communication interface," a second "contact unit" has a "transport interface," and a third "contact unit" has an "auxiliary voltage interface."  Ehsani ¶ 60.

which a contact unit at the end of a cable is used to "contact" another ESC.  Ehsani ¶ 64.

**B.    "Gateway for Coupling the At Least One Contact Unit with the Energy Store" Is Indefinite**

Unicorn states that the "applicant as lexicographer clearly and unmistakably defined 'gateway' as a 'coupling unit' in the specification." Open. Br. at 17.  If true, then Unicorn's cited cases regarding prior constructions of "gateway" terms are irrelevant, because the cases dealt with uses of "gateway" in telecommunications contexts that have nothing to do with a "gateway"/"coupling unit," as defined in the '869.[4]  *Honeywell Int'l, Inc. v. Universal Avionics Sys. Corp.*, 493 F.3d 1358, 1361 (Fed. Cir. 2007) ("When a patentee defines a claim term, the patentee's definition governs, even if it is contrary to the conventional meaning of the term."). Because "gateway" is synonymous with "coupling unit," and because there is no plain and ordinary meaning of the term "coupling unit," "gateway"/"coupling unit" is a nonce term that invokes § 112 ¶ 6 under *Williamson* and *Canon*, for the reasons in Section IV.A regarding "unit" terms. Ehsani ¶¶ 71-76; *TriMed*, 514 F.3d at 1259-60.  Like "contact unit," "gateway"/"coupling unit" is recited in means-plus-function format using a nonce term ("unit") followed by its function ("for coupling the at least one contact unit with the energy store").  Ehsani ¶¶ 71-76.

Unicorn asserts that a "coupling unit" may be referred to as a "coupler"—a term that appears nowhere in the '869 and that Unicorn appears to have introduced to take advantage of a convenient dictionary definition.  *See* Open. Br. at 17-18.  The term "coupler" is inconsistent with the patentee's lexicography of "coupling unit."  In addition, as explained by Dr. Ehsani, a POSA

---

[4] *See* Open. Br. at 16-17 (citing *Starhome GmbH v. AT & T Mobility LLC*, 743 F.3d 849, 854 (Fed. Cir. 2014) (addressing "[a]n *intelligent gateway* associated with a first *cellular telephony network*"); *SimpleAir, Inc. v. Google, Inc.*, No. 13-cv-937-JRG, 2015 WL 1906016, at *19 (E.D. Tex. Apr. 27, 2015) (addressing an "*information gateway*" and "*transmission gateway*" in the context of a "system and method for data communication connecting *on-line networks*")).

would not have been familiar with the term "coupler" and would not have associated the term or Unicorn's cited definition for the term with the '869's "coupling unit." Ehsani ¶¶ 84-85, 90. Moreover, Unicorn's cited definitions of "coupler" are limited to components/devices that "transfer energy from one circuit to another," such as a "transformer." Open. Br. at 18. These definitions of "coupler[s]," if adopted as constructions for "gateway"/"coupling unit," would improperly exclude a preferred embodiment shown in Fig. 1 from the scope of the claims, given that Fig. 1 could be interpreted as depicting a coupling unit for transferring "data" (see item "20"), not power. *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1311 (Fed. Cir. 2014) ("We normally do not construe claims in a manner that would exclude the preferred embodiment[.]"). Thus, it would be improper to construe "gateway"/"coupling unit" as "coupler."

The only structure referenced as potentially being associated with a "gateway"/"coupling unit" is a "controlling device." *See* '869, claim 2. However, "the controlling device can be located elsewhere in the ESC" and, besides claim 2, a gateway does not require a controlling device. Open. Br. at 4 (citing '869, 14:25-28). Other than the controlling device, the specification describes the "gateway"/"coupling unit" as a black box that could include anything. *See, e.g.*, Fig. 1 (item "18"), Fig. 9 (item "18"), Fig. 10 ("GW1"). Ehsani ¶¶ 76, 78. Because "gateway" invokes § 112 ¶ 6, or, at the very least, is a coined term under *Indacon*, it is indefinite in view of the fact that there is no structure clearly linked to the term in the specification.

The term would also be indefinite under § 112 ¶ 2. Unicorn's arbitrary attribution of unrecited, separately described, and/or unrelated components to the recited "gateway" shows that the term has no reasonably certain scope. Ehsani ¶¶ 71-76, 83. For example, as discussed in the Introduction and herein, Unicorn suggests that the gateway could include a litany of "parts" that are not recited in the claims, including a "DC-DC converter," "connecting wires," "resistors,"

"diodes, etc." Open. Br. at 18. In particular, Unicorn asserts that portions of the functional group 16 in the green box added by Mr. Dillard to Fig. 9 (*see, supra*, Introduction) are somehow associated with a "gateway," including the DC-DC converter 79 and box 77, labeled "Technical data of the gateway." *See, supra*, Introduction; Open. Br. at 18. However, Fig. 9 is clearly marked at the bottom to identify and distinguish the gateway/coupling unit ("18") on the right from the functional group ("16") on the left, the latter (functional group) being described in the specification as containing the DC/DC converter 79, technical data 77, and "sensors" (i.e., measurement values) 75. *See, e.g.*, '869, Fig. 9, Fig. 10 (showing coupling units, labeled "GW1," separate from DC/DC converters), 8:1-3 ("it can be provided that the *functional group* has at least one *direct current converter*"), 18:15-16 ("the *functional group 16* can have a bidirectional *direct current converter 79*"), 18:18-22 ("Parameters that predefine boundary conditions can be stored in a *data set 77* . . . in the *functional group 16* and are thus available to the bidirectional *direct current converter 79*."), 18:26-28 ("*sensors 75* are arranged in the *functional group 16*, said sensors measuring actual values within the *functional group 16*"), 18:48-53 ("Each of the supply network components 10, 92, 94, 95, 96, 97, 98 designed as energy stores comprises within its *functional group* a dedicated *direct current converter*[.]"); Ehsani ¶¶ 89-91. In the claims, DC/DC converters are only associated with "energy stores," not gateways/coupling units. *See* '869, claims 7-8. There is no structure that is definitively associated with the gateway.[5]

### 1. Alternatively, "Gateway" Should Be Construed to Mean "A Single Part that Serves as a Point of Entry and Exit to Another System"

If the Court determines that the "gateway" term is not indefinite, it must be limited to its

---

[5] If "gateway" is held to invoke § 112 ¶ 6 but is not held to be indefinite, for the reasons discussed herein it should be construed to have the function of "coupling the at least one contact unit with the energy store" and the structure of "the coupling unit 18 shown in Figs. 1, 9, and 10 and described in related portions of the specification." Ehsani ¶¶ 79-82.

descriptions in the intrinsic record, because "gateway" is a coined term. *Indacon*, 824 F.3d at 1357. These descriptions are reflected in Tesla's alternative construction. Ehsani ¶¶ 71-76, 84-88. As noted above, the term "gateway" is not used in accordance with its meaning in the telecommunications field. Ehsani ¶ 71. Instead, to the extent any meaning can be attributed to the term, it would arise from the patent's description of every embodiment of a "gateway"/"coupling unit" as a single part (sometimes including a controlling unit as a subpart) that serves as a point of entry and exit to another system. Ehsani ¶¶ 84-88. This construction is consistent with, for example, the patent's depiction of supply network component 94 in Fig. 10, which includes a gateway that serves as a point of entry and exit to a "wind turbine" system. This construction is also consistent with dictionary definitions for "gateway" served by Unicorn and discussed in Dr. Ehsani's declaration: (1) "an entrance that may be closed by or as by a gate," (2) "a means of entry or access," (3) "[a] point of entry and exit to another system, such as the connection point between a local-area network and an external-communications network," and (4) "an entrance that is accessible through a gate." Ehsani ¶ 85 (citing Ex. 14 at 3225, Ex. 15 at 3264, Ex. 16 at 3244).

## C. "Energy Storing Component," "Energy Store," "Functional Group," and "Supply Network Component" Are Indefinite

A POSA would not understand these coined terms with reasonable certainty because they are inadequately described and imbued with ambiguity in the intrinsic record. Ehsani ¶¶ 144-63, 171-75; *Iridescent Networks, Inc. v. AT&T Mobility, LLC*, 933 F.3d 1345, 1353 (Fed. Cir. 2019) (for "a coined term . . . the question is whether the intrinsic evidence provides objective boundaries to the scope of the term."). The indefiniteness injected into the claims by these terms is reflected in: the patentee swapping one coined term for another during prosecution and now portraying such substantive claim amendments as being meaningless (and merely including typographical errors); the extensive circular and ambiguous descriptions of the coined terms within the specification; and

Unicorn's proposed nonce constructions that do nothing to identify any reasonably certain structure for the coined terms. *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014) ("absent a meaningful definiteness check . . . patent applicants face powerful incentives to inject ambiguity into their claims" and, as such, "[e]liminating that temptation is in order, and the patent drafter is in the best position to resolve the ambiguity in ... patent claims.").

First, the "energy storing component" term that Unicorn invented to replace some, but not all, instances of "supply network component" in the final amendment to the claims during prosecution fundamentally altered the scope of the claims. *See* Ex. 2 at 2-7. Whereas the original "supply network component" could serve as "an energy store, an energy converter or energy source or else an energy consumer" having any of the functions of storing, converting, sourcing, or consuming energy (*e.g.*, '869 at 1:18-20), Unicorn admits that the coined "energy storing component" is only an "energy store" and "has the function of storing energy" (Open Br. at 7). Unicorn's statement that the asserted claims "of the '869 patent relate to an energy storing component (ESC) for supplying consumers with electrical energy" would not actually be possible because the "energy storing component" only "has the function of storing energy"—i.e., it serves as an "energy store" not an "energy source" to consumers. Open. Br. at 1; Ehsani ¶ 163. This is reflected in the specification's distinction between a "supply network component as energy store" and "***other*** supply network components in the form of energy sources." '869, 1:21-22. It is further reflected in the specification's teaching of "[r]echargeable batteries ***as energy stores and as energy sources*** in voltage networks." '869, 1:21-22. A POSA would understand that when a rechargeable battery is an "energy store" it receives charge and when the battery is an "energy source" it supplies charge to another device. Ehsani ¶ 163. Unicorn cannot contend on the one hand that a POSA would be able to understand the term "energy storing component," because it is limited to an

"energy store," while on the other hand asserting that it serves as an "energy source." Ehsani ¶ 163. These blatantly contradictory positions demonstrate how Unicorn is seeking to capitalize on the ambiguity it injected into the claims with the coined term "energy storing component."

Second, the indefiniteness of "energy storing component" is shown by the fact that "energy storing component" is recited within the claims using the open transition phrase "comprising." Ehsani ¶ 147. A POSA would not be able to ascertain what else could be included in an "energy storing component," making it impossible to distinguish between two "contacting" energy storing components. *Id.* For example, Unicorn (wrongly) argues that "contacting" between two "energy storing components" could be implemented using a wire connection, as discussed above in Section IV.A. If, under Unicorn's construction, a wire is used to "contact" another ESC, does the wire constitute part of both ESCs? One ESC? Neither? The lack of any definite structure of the "energy storing component" makes such an assessment entirely arbitrary.

Third, the ambiguity of the coined terms is further demonstrated by the fact that "energy store," "functional group," and "supply network component" are repeatedly and ambiguously conflated with each other within the specification, confounding any attempt to discern any distinct scope with reasonable certainty. Ehsani ¶¶ 144-63, 171-75; *see, e.g.*, '869, 1:18-20 ("***the supply network component can in this case be an energy store***"), 13:62-63 ("***[t]he functional group 16 can be configured for example as energy store***"); 18:52-53 ("the respective ***functional group of each supply network component***"). During prosecution, the claims originally recited a "functional group having at least one functional unit." Ex. 2 at 2-7. The ambiguity of the "energy store" is further reflected in that even the "functional unit" of the "functional group" is also described as an "energy store." '869, 5:6-7 ("***the at least one functional unit is an energy store***"), 8:39-40 ("***the functional group has a plurality of functional units each designed as an energy***

*store*").  The specification's ambiguity with respect to these coined terms renders them indefinite.

Fourth, Unicorn's proposed constructions do nothing to provide any reasonable certainty regarding the scope of the coined ESC and "energy store."  The general rule is that different claim terms have different meanings.  *Chicago Bd. Options Exch., Inc. v. Int'l Sec. Exch., LLC*, 677 F.3d 1361, 1369 (Fed. Cir. 2012).  Unicorn argues against this general principle, proposing that all four of these terms should effectively be construed to mean "anything that stores energy."  For example, Unicorn's proposed construction for "energy storing component" ("***device*** that stores energy") is not meaningfully different from its proposed construction for "energy store" ("***unit*** that stores energy"), even though an "energy store" is ***claimed*** as a ***component of*** an ESC.[6]  Ehsani ¶ 153. Moreover, Unicorn's reliance on the well-established "nonce" words "unit" and "device" demonstrates the four terms have no reasonably certain connotation.  *Canon*, 2020 WL 2098197, at *25 ("'unit' is a nonce term"); *Williamson* 792 F.3d at 1350 ("device" is a nonce word). Unicorn's proposal to construe "functional group" to mean "energy store" further muddies the water, given that Unicorn proposes to construe "energy store" as a "unit that stores energy."  Fig. 9 depicts an exemplary "functional group" (item "16").  If a functional group is a "unit that stores energy," then what is the claimed "unit"?  All of the subparts of the functional group labeled "16" (i.e., the battery, DC/DC converters, etc.)?  Some subset of these subparts?  Only the battery?  A POSA would not know.  Ehsani ¶¶ 171-72.

Finally, Unicorn argues that claim 27's references to "supply network component" and claim 9's reference to a "functional group" are typographical errors, and that these terms should

---

[6] Unicorn's construction of "energy store" to include "such as a battery" is inconsistent with the full scope of the specification's various disclosures for "energy store," misleading to the extent it seeks to limit "energy store" to a battery, and would result in redundant and superfluous claim language since the claims expressly recite "an energy store ***comprising at least one battery cell***."

be rewritten to mean, respectively, "energy storing component" and "energy store." Open. Br. at 28-30. Such an amendment would only be appropriate if "the correction is not subject to reasonable debate based on consideration of the claim language and the specification." *Novo Indus., L.P. v. Micro Molds Corp.*, 350 F.3d 1348, 1354 (Fed. Cir. 2003). That is not the case here. Claim 27 references a plurality of "supply network components" that are "connected in parallel or in series with one another," which would include not only to the "energy storing component[s]" recited in claim 27, ***but also any other components in the supply network*** (e.g., energy "converter[s]," "source[s]," or "consumer[s]"—'869, 1:18-20). *See* Ehsani ¶¶ 156-63. It would therefore be improper to construe "supply network component" to mean "energy storing component," because it would alter the requirement that ***all*** components of the "supply network" be connected in parallel or in series. Similarly, a POSA would not interpret "functional group" to solely refer to an "energy store." Ehsani ¶¶ 171-72. For example, claim 9 refers to a sensor "for detecting a physical parameter of the functional group," such as functional group "16" in Fig. 9. '869, 18:14-17, Fig. 9. Because claim 9's "sensor" could detect parameters in parts of the functional group that have nothing to do with energy storage (e.g., the DC/DC converter in Fig. 9), the scope of "functional group" cannot be the same as "energy store." *Id.*

### D.    "Supply Network" Is Indefinite

A POSA would not understand this term with reasonable certainty because the phrase "supply network" has no commonly understood meaning in the art and the intrinsic record fails to define the phrase with reasonable certainty. Ehsani ¶¶ 156-63. The specification states: "the ***supply network component*** can in this case be an energy ***store***, an energy ***converter***, or an energy ***source*** or else an energy ***consumer***." '869, 1:18-20. The relevant "network" therefore comprises components that can not only "supply" electrical energy, but can also store, convert, and consume it. Ehsani ¶ 163; *See, e.g.*, Ex. 16 ("supply": "the provision of something that is needed"). A

POSA would not understand the meaning of the word "supply" in "supply network," given the specification's description of a network that must do more than simply "supply" electrical energy. Ehsani ¶ 156, 163.  Moreover, as noted above in Section IV.C, the coined "energy storing component" can only function as an "energy store." This further demonstrates the indefiniteness of the claims in that, if "supply network" had reasonably certain meaning, Unicorn would not have to contradict itself by arguing that an ESC stores energy and that the "supply network" *formed by those ESCs* does the opposite—supplies energy.

### 1.    Alternatively, the Term Should Be Construed: "A Distributed Network that Includes Physically Contacting Energy Storing Components"

Unicorn misunderstands Tesla's alternative construction for this term.  First, Tesla did not intend to construe this term to require the "supply network" to *solely* consist of "physically contacting energy storing components."  For purposes of clarity, Tesla now proposes that this term be construed to mean "a distributed network that *includes* physically contacting energy storing components."  The claimed network includes physically contacting ESCs because all claims require an ESC that includes "at least one contact unit for contacting" (i.e., physically touching) "a further energy storing component," as discussed above in Section IV.A.  Second, Unicorn misunderstands the meaning of "distributed network."  Ehsani ¶ 158.  The word "distributed" "has nothing to do with the physical location of the network components."  *Id.*  Instead, "it refers to the distributed nature of *control* over the overall network: there is no centralized controller that dictates how the various network components should behave."  *Id.*; Ex. 6 ("distributed network": "network in which functions such as processing and storage are handled by multiple nodes, as opposed to a single computer"); '869, 6:2-5 ("The individual energy stores are permitted to be distributed . . . and form a shared intelligent electricity network.").

Because the term "supply network" is a coined term, it must be limited to its descriptions

in the intrinsic record. *Indacon*, 824 F.3d at 1357. The intrinsic record defines "supply network" as a "distributed network." Ehsani ¶¶ 157-62. First, the claims recite that ESCs autonomously (1) identify their own compatibility with the network and (2) connect themselves to the network. *See* '869, claims 1, 28. The patent differentiates this claimed paradigm from prior art architectures that used a "centrally controlled energy supply," noting that "present-day large multi-cell battery systems exhibit a number of fundamental problems." '869, 3:29-30, 3:35-36. The '869's supply network is a ***distributed*** network because ESCs' autonomous identification of compatibility and connection to the network is antithetical to a centralized-controller paradigm, given that a centralized controller would not be able to control such ESCs' compatibility/connection to the network. Ehsani ¶¶ 157-62.

The file history conclusively shows that the claimed supply network is a distributed network that precludes use of a centralized controller. The file history confirms that the claimed supply network includes "several ***independent*** energy storage components." Ex. 2 at 9 ("[E]ach energy storing component ***determines its own compatibility*** 'autonomously,' and ***decides on its own*** whether to connect or not" to the network.). An ESC subject to control by a centralized controller could not be "independent" and therefore would not fall within the scope of the '869's claims. Ehsani ¶ 157-61. The patentee further distinguished between an ESC that has an "external" "controlling device" (as in the prior art "WO 873" reference) and one that controls itself independently (as claimed in the '869). *See* Ex. 2 at 10-12 ("WO 837 states that the control circuit is to be placed externally . . . . Therefore, WO 837 cannot possibly teach or suggest an 'autonomous' control of each energy storing component regarding its compatibility."), 14 ("the energy storage device of Davis relies upon 'identification data' received from the [external] electronic device, and thus the energy storage device does not 'autonomously' identify an

21

incompatibility"). The '869's file history therefore evidences a clear disclaimer and disavowal of energy storage systems that include a centralized controller. *Omega Eng'g, Inc, v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("[W]here the patentee has unequivocally disavowed a certain meaning to obtain his patent[, it] narrows the ordinary meaning of the claim[.]").

Unicorn's proposed construction fails to account for the foregoing disclaimer/disavowal and improperly limits the "supply network" to one "for ***supplying consumers*** with electrical energy," based on the specification's description of the "present invention." As discussed above, the patent describes the claimed "network" as including components for storing, converting, and consuming electrical energy and should not be limited to a network that solely supplies "consumers." *Netcraft Corp. v. eBay, Inc.*, 549 F.3d 1394, 1398 (Fed. Cir. 2008) ("[T]he phrase 'the present invention' does not 'automatically' limit the meaning of claim terms in all circumstances"—"such language must be read in the context of the entire specification and prosecution history."). Also, nothing in the specification or file history disclaims or disavows "supply network[s]" that are not "scalable collection[s] of interconnected electrical devices."

### E.    "Transport Interface," "Communication Interface," and "Auxiliary Voltage Interface" Invoke § 112 ¶ 6

These terms invoke § 112 ¶ 6 because they are written in means-plus-function format using nonce terms followed by functions without specify structures that perform the functions ("transport interface for transporting," "communication interface for communicating," "auxiliary voltage interface for transmitting"). *TriMed*, 514 F.3d at 1259-60; *see Genband USA LLC v. Metaswitch Networks Ltd.*, No. 2:14-CV-33-JRG-RSP, 2015 WL 4722185, at *12 (E.D. Tex. Aug. 7, 2015) (terms that "could refer to ***any*** structure[s]" invoke § 112 ¶ 6); *Canon*, 2020 WL 2098197, at *25 ("communication unit" invoked § 112 ¶ 6); *see also Quest Licensing Corp. v. Bloomberg L.P.*, C.A. No. 1:14-561-GMS-LPS, D.I. 138 (D. Del. Mar. 11, 2016) (Ex. 17) ("a generic 'interface'

lacks any sort of physical limitations.").  Moreover, given that each of these terms is part of a "contact unit," a POSA would necessarily refer to the specification to find structure associated with the terms, given that "contact unit" invokes § 112 ¶ 6, as discussed in Section IV.A.  Ehsani ¶¶ 55-60, 92-101, 111-18, 128-34; *TriMed*, 514 F.3d at 1259-60.  Even if these terms do not invoke § 112 ¶ 6, they are coined terms that must be limited to their embodiments in the specification, as proposed in Tesla's alternative constructions below.  *Indacon*, 824 F.3d at 1357.

Dictionary definitions confirm that "interface" does not connote any particular structure.  *See, e.g.*, Ex. 18, Comprehensive Dictionary of Electrical Engineering, 1999 at 335 ("interface": "set of rules"); Ex. 19, McGraw-Hill at 300 ("interface": "electronic device that enables one piece of gear to communicate with or control another"); Ex. 20, Newton's Telecom Dictionary, 26th Edition, 2011 at 618 ("interface": "link connecting . . . equipment"); *see, e.g.*, Ehsani ¶¶ 113-18.

> **1.**    **"Transport Interface" Should Be Construed to Have a Function of "Transmitting the Electrical Energy to the Further Energy Storing Component" and a Structure of "A Rotationally Symmetrical Structure Designed in a Coaxial Fashion with Respect to an Auxiliary Voltage Interface, Consisting of either Spring Contact Pins or Two Ring-Shaped, Coaxial Contacts—One for Ground and Potentially Comprising Insulating Webs, as Described in the Specification, and Equivalents Thereof"**

A POSA would have identified Tesla's proposed function and structures as corresponding to the "transport interface" term because they are the only examples of transport interfaces that (1) are in contact units for contacting further ESCs and (2) transmit electrical energy to such ESCs.  Ehsani ¶¶ 119-24; '869, 9:51-10:21, 15:41-16:15; *Asyst Techs., Inc. v. Empak, Inc.*, 268 F.3d 1364, 1370 (Fed. Cir. 2001) ("Structural features that do not actually perform the recited function do not constitute corresponding structure[.]").  The specification describes Tesla's identified structures as "transmitting" electrical energy to a further ESC.   Ehsani ¶ 119-24; *see* '869, 14:51-54 ("Furthermore, each of the contact units 12, 14 has a transport interface 36, which provides an

interface for **transmitting** the network medium, electrical energy in the embodiment explained[.]"); *id.*, 16:7-15 ("The spring contacts 51, 53 form the transport interface 26 of the second contact unit 14.  In this case, the spring contact 49 and also both the spring contact 51 and the spring contact 53 can in each case be designed as spring contact groups[.]  The power that can then be **transmitted** via a spring contact group can be increased in this way.").)

The specification briefly mentions an unclaimed embodiment of a "transport interface" that "can be embodied in a wired fashion."  '869, 15:13-15.  The patent provides no exemplary embodiment of such a "wired" transport interface and does not suggest that it could be part of a "contact unit for contacting a further energy storing component."  *B. Braun Med., Inc. v. Abbott Lab'ys*, 124 F.3d 1419, 1424 (Fed. Cir. 1997) (structure must be "clearly linked to the function recited in the claim").  The "wired" embodiment is not corresponding structure because it does not describe any structure that could transmit electrical energy to an ESC, as a bare wire cannot "generate, gate, or control electrical energy by itself" and, therefore, "could not function as a transport interface for transmitting electrical energy."  Ehsani ¶¶ 122-23.  The same applies to the "cable" embodiment that Unicorn identifies as corresponding structure.  *See* '869, 17:59-65 ("it can be provided that [contact units] are provided with cables in order, besides the standard interfaces 34, 36, 38 illustrated in FIGS. 7 and 8, to provide a connection to other functional groups").  This embodiment does not even mention the term "transport interface" and, like the "wired" embodiment, does not describe any structure that could transmit electrical energy to an ESC as part of a contact unit.  Ehsani ¶ 124.  In addition, for the reasons in Section IV.A, a POSA would not recognize the "cables" as describing structure associated with a contact unit or its constituent transport interface.  Ehsani ¶¶ 63-66.

> **a.** **Alternatively, "Transport Interface" Should Be Construed to Mean "A Point at which Two Energy Storing Components**

### Contact for Transmitting Electrical Energy"

If "transport interface" is not held to invoke § 112 ¶ 6, it should be construed according to Tesla's alternative construction.  Ehsani ¶¶ 125-27.  The claimed transport interfaces are part of contact units that contact further ESCs, as explained in Section IV.A, and the transport interfaces must therefore be points at which two ESCs contact.  *Id.*  Unicorn's dictionary definitions define an interface as a "point."  *See, e.g.*, Ex. 16 at 3247 ("1. a point at which one computer system ends and ether begins").  Every transport interface shown in the patent is in contact (or at least designed to be in contact) with another transport interface of another ESC.  '869, Figs. 1, 2, 3, 7, 8, 9, 10.  Ehsani ¶¶ 125-27.  For instance, transport interfaces in Fig. 10 are depicted as white circles with arrows pointing to adjacent ESCs to which they transmit electrical energy.  Ehsani ¶ 126.

> 2. **"Communication Interface" Should Be Construed to Have a Function of "Exchanging Information With a Further Energy Storing Component Capable of Understanding the Information" and a Structure of "An RFID Transponder for Transmitting and Receiving all Required Technical Data and Physical Parameters Between Energy Storing Components, and Equivalents Thereof"**

A POSA would have identified the function associated with a "communication interface" to be the exchange of *understandable* information with a further ESC because, "[v]ia the communication interface, all required technical data and physical parameters can be exchanged electronically between supply network components."  '869, 9:8-11; *see also id.*, 5:17-25, 10:45-49, 11:41-49, 14:33-48; Ehsani ¶ 102.  Information exchanged between ESCs must be understandable because the information is "required" to ensure safe operation of the supply network, as explained in the file history.  Ex. 2 at 9-10 (only after "authentication and identification (via the *communication interface*) of the compatibility of said energy storing component to the present supply network" "will a connection be made, and doing so will be safe as *compatibility is ensured*")  Unicorn's opposition to Tesla's inclusion of the word "understandable" reflects its

intention to accuse Tesla products that merely *relay* information instead of *exchanging understandable* information. *E.g.*, Ex. 20 at 11 ("In multi-Powerwall systems, communication wiring is daisy-chained between Powerwall units."). The mere relay of data cannot perform the claimed function of communicating *with* a further ESC, which requires an *exchange* of *understandable* information. Ehsani ¶ 102; Ex. 21 ("communicate": "If one person communicates with another, they successfully make each other aware of their feelings and ideas.").

Tesla's proposed structures correspond to the "communication interface" term because the only disclosed communication interface that is (1) for communicating with a further energy storing component and (2) part of a contact unit for contacting a further ESC is "an RFID communication interface." *See, e.g.*, '869, 15:14-23 ("In particular, however, it is provided that the communication interface 34 communicates with *adjacent* supply network components 10 by means of *RFID* techniques."); *see also id.*, 10:29-41, 16:44-47. Only an RFID transponder is described as accomplishing the aims of the claimed invention. *See, e.g.*, *id.*, 15:20-22 ("RFID communication is chosen for data transmission between intelligent electricity network components. . . . This enables . . . *galvanic isolation* of the data mesh 20 from the power mesh 22[.]"); Ehsani ¶ 104.

Unicorn identifies the "so-called 'EnergyBus' standard" based on "CANopen (Controller Area Network)" as structure associated with a "communication interface," but this language describes an unclaimed and disparaged implementation from the prior art. '869, 3:7-8 ("The routing of the electricity [in this implementation] *cannot* be comprehended unambiguously."); Ehsani ¶ 104. Unicorn also identifies an additional "wired" embodiment as supposedly corresponding structure. *See id.*, 15:14-18 ("The communication interface . . . can be embodied in a wired . . . fashion[.] [C]apacitive, inductive or optical transmission can also take place[.]"). However, immediately after mentioning this unclaimed embodiment, the specification identifies

26

the *claimed* embodiment: "however, it is provided that the communication interface 34 communicates with *adjacent* supply network components 10 by means of *RFID* techniques." Moreover, as explained by Dr. Ehsani, this "wired" embodiment only describes general *modes* of communication ("capacitive, inductive or optical") and does not disclose *structure* capable of actually "communicating with" an ESC.  Ehsani ¶¶ 105-06; *Braun*, 124 F.3d at 1424.

>  a.   **Alternatively, "Communication Interface" Should Be Construed to Mean "A Point at which Two Energy Storing Components Interact for Exchanging Understandable Information"**

If the "communication interface" term does not invoke § 112 ¶ 6, it should be construed according to Tesla's alternative construction.  Ehsani ¶¶ 107-10.  Every communication interface shown in the patent is located at a point where two ESCs interact.  '869, Figs. 1, 3, 9, 10; Ehsani ¶¶ 108-09.  As discussed in Section IV.E.1.a, Unicorn produced dictionary definitions that define an interface as a "point."  Fig. 10 shows communication interfaces as white squares with arrows pointing to adjacent ESCs with which they interact.  Ehsani ¶¶ 108-09.  Unicorn's proposed construction "would render the term 'communication interface' indefinite, because a POSA would not know which 'component(s)' form part of a communication interface—for example, components used to provide power to the communication interface could theoretically be included," but a POSA would not know one way or the other.  Ehsani ¶ 109.

>  3.   **"Auxiliary Voltage Interface" Should Be Construed to Have a Function of "Transmitting Auxiliary Voltage for Supplying at Least One of the Contact Unit or the Gateway with Electrical Energy" and a Structure of "A Rotationally Symmetrical Structure Designed in a Coaxial Fashion with Respect to the Transport Interface in the Form of Either a Centrally-Formed Spring Contact or a Mating Contact"**

Tesla's construction identifies the only function and structure associated with an auxiliary voltage interface that is part of a contact unit for contacting a further energy storing component. Ehsani ¶¶ 128-44.  '869, 7:38-42, 14:55-59, 16:3-5, 17:36-43.  Although the specification

27

references an "auxiliary voltage interface" that "can be embodied in a wired fashion," *id.*, 15:13-14, and the "cable" embodiment discussed above in Section E.1, these embodiments are not claimed. Ehsani ¶ 139 ("[A] POSA would not recognize this reference to a 'wired' embodiment as structure associated with the claimed auxiliary voltage interface. . . . The foregoing reference to a "wired" embodiment does not describe any structure that could perform the claimed function[.]"). If the Court declines to construe this term under § 112 ¶ 6, it should alternatively be construed to mean "a point at which two energy storing components meet for transmitting auxiliary electrical energy with each other," for substantially the same reasons above in Section E.1.a.

### F.     "Network Medium" Means "Electrical Energy in a Distributed Network"

For the reasons in Section IV.D, above, the claimed "network" is a "distributed network." Unicorn's construction is incorrect to the extent it construes "network" to cover non-distributed networks governed by centralized controllers, which were never within the scope of the '869.

### G.     "Configured to Cooperate with the Communication Interface" Is Indefinite

A POSA would not understand this term with reasonable certainty. Ehsani ¶¶ 165-66. Nothing in the intrinsic record explains how an ESC may "cooperate" with a communication interface (i.e., cooperate with part of itself). The Federal Circuit has held that components that "cooperate with" each other are necessarily "separate" and "distinct." *In re: LF Centennial Ltd.*, 654 F. App'x 491, 496 (Fed. Cir. 2016) (noting that "spine" and "side panels" were "separate components" because they "'cooperate with' each other," the latter language providing a "clear distinction between the components"). The "configured to cooperate" element is therefore illogical and indefinite to the extent it states that an ESC must be "configured to cooperate with" itself. As such, a POSA would not know whether the referenced "communication interface" belongs to a different ESC or, if not, how an ESC could be configured to cooperate with a component part of itself. Ehsani ¶¶ 165-66.

### 1. Alternatively, the Term Should Be Construed: "Configured to Work Together with the Communication Interface"

If the Court determines this term is not indefinite, Tesla's alternative construction better comports with the plain and ordinary meaning of the word "cooperate." *See* Ehsani ¶ 166; Ex. 23 ("cooperate": "to act or work with another or others"). Unicorn's construction deviates from the plain and ordinary meaning, interjecting language that Unicorn acknowledges is redundant of its construction of "communication interface": "*as explained in Section IV.G supra*, the purpose of a communication interface is to obtain information." Open. Br. at 24. At best, Unicorn's construction leads to the unhelpful observation that an ESC may obtain information from itself.

### H. The Terms "An Autonomous Identification of Incompatibility [/ Compatibility]" Are Indefinite

These terms have no reasonably certain meaning to a POSA. Ehsani ¶¶ 167-68. "Compatibility" is a "widely misused and especially vague" term. Ex. 22 ("compatible": "A widely misused and especially vague word"); Ehsani ¶ 167. The only relevant description of these terms in the specification appears in a list of steps performed by one embodiment of a "supply network": "after authentication, *identification of compatibility* and compliance with the physical limits, each supply network component is individually turned on or off." '869, 8:57-60. The "identification of compatibility" in this example is distinguished from "authentication" and "compliance with the physical limits," implying that an "identification of compatibility" must be something other than "authentication" or "compliance with the physical limits." Ehsani ¶ 167. However, the '869 does not explain what this additional "compatibility" check should entail.

The patent's file history likewise fails to elucidate the compatibility terms. *See, e.g.*, Ex. 2 at 2-14. Like the specification, the file history distinguishes between "authentication" and "identification (via the communication interface) of the compatibility of said energy storing component to the present supply network." *Id.* at 9. Aside from this statement, the file history

merely states that the identification of compatibility/incompatibility is to be made autonomously, as recited in the claims. *Id.* at 12-13. Nothing in the intrinsic record explains what aspect(s) of an ESC must be compatible with the supply network or how such compatibility could be determined.

### 1. Alternatively, the Terms Should Be Construed: "An Identification, by the Energy Storing Component, of Incompatibility [/ Compatibility] with the Supply Network"

Tesla's alternative constructions reflect the plain and ordinary meanings of the terms. Ehsani ¶¶ 169-70. Unicorn's proposed constructions unnecessarily import limitations related to other claim language into the compatibility terms. For example, Unicorn's proposed limitations about "the energy storing component monitoring communications with one or more other devices on the supply network" and "using at least information derived from such communications" are improper because the claims separately recite that an ESC is "configured to cooperate with the communication interface such that the energy storing component is separated from the network medium" in the event of incompatibility. Similarly, the claims separately recite that an ESC "is separated from the network medium," and Unicorn's importation of a limitation regarding "whether to separate from the network medium" is therefore improper. Finally, as discussed above, the specification distinguishes between identifications of compatibility and "compliance with the physical limits" (i.e., "physical parameters of the supply network"). '869, 8:57-60.

### I. "Controlling Device" Requires No Construction

Unicorn improperly attempts to read in limitations from the specification by construing "controlling device" as a "microcontroller or other programmable circuit." *Thorner v. Sony Computer Ent. Am. LLC*, 669 F.3d 1362, 1366–67 (Fed. Cir. 2012). Nothing in the intrinsic record requires a controlling device to be "programmable." This term does not require construction.

### V. CONCLUSION

For the reasons above, Tesla respectfully requests that the Court adopt its proposals.

Dated: July 30, 2021                    _/s/ Heidi Keefe_

                                      Deron R. Dacus
                                       Texas Bar No. 00790553
                                       THE DACUS FIRM, PC
                                       821 ESE Loop 323, Suite 430
                                       Tyler, TX 75701
                                       (903) 705-1117
                                       ddacus@dacusfirm.com

                                       *Counsel for Defendant Tesla, Inc.*

OF COUNSEL:

Michael G. Rhodes
COOLEY LLP
101 California Street, 5th Floor
San Francisco, CA 94111
Telephone: (415) 693-2000

Heidi Keefe
Alissa M. Wood
COOLEY LLP
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000

Adam Pivovar
Samuel K. Whitt
Elizabeth C. Shrieves
COOLEY LLP
1299 Pennsylvania Avenue, NW
Suite 700
Washington, DC 20004-2446
Telephone: (202) 842-7800

**CERTIFICATE OF SERVICE**

I hereby certify that all counsel of record who are deemed to have consented to electronic service are being served on this 30th day of July, 2021, with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3).  Any other counsel of record will be served by electronic mail, facsimile transmission and/or first-class mail on this same date.

*/s/ Heidi Keefe*
Heidi Keefe

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| whether the preamble is limiting (claims 1, 27) | the preamble is limiting.<br><br>**Intrinsic Evidence**<br><br>Claims.<br><br>**Extrinsic Evidence**<br><br>Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report.<br><br>Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | Limiting<br><br>**Intrinsic Evidence**<br><br>Claims.<br><br>'869 patent at 18:62-19:14.<br><br>The '869 patent's file history, including at least the following:<br><br>Amendment and Response Submitted with Request for Continued Examination of 3/5/2018.<br><br>**Extrinsic Evidence**<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "distributed network": "A communications network in which resources, such as processors and switching equipment, are distributed throughout multiple locations, as opposed to one . . . . A computer network in which functions such as processing and storage are handled by multiple nodes, as opposed to a single computer."<br><br>Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto.<br><br>Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| "energy storing component" (all asserted claims) | not indefinite;<br><br>"device that stores energy"<br><br>**Intrinsic Evidence**<br><br>Title, Abstract, Claims, 1:14-20, 1:23-31, 5:17-25, 5:30-34, 5:42-6:3, 6:27-30, 8:54-57, 10:26-28, 11:16-36, 11:49-52, 12:25-31, 12:36-37, 12:45-48, 12:55-61, 13:61-64.<br><br>FIGs. 1-6, 9-11, and related portions of the specification, including 13:23-24, 13:61-64, 16:21-24, 16:61-66, 18:37-61, 18:64-67. | Indefinite;<br><br>**Intrinsic Evidence**<br><br>Claims.<br><br>'869 patent at 4:43-5:29, 5:17-25, 5:63-6:13, 8:28-42, 12:17-22, 13:50-21:12; Fig. 2.<br><br>The '869 patent's file history, including at least the following:<br><br>Amendment and Response Submitted with Request for Continued Examination of 3/5/2018.<br><br>Notice of Allowance of March 26, 2018. |

---

[1] The parties' position is that the ordering of claim terms in this joint filing does not necessarily reflect the relative importance or unimportant of any claim term.

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, July 21, 2017 Amendment and Response to Office Action.<br><br>**Extrinsic Evidence**<br><br>Dictionary of Science & Technology (2d ed. 2003) (definitions of "component" and "energy") (UNICORN_00003234, UNICORN_00003241-UNICORN_00003242).<br><br>McGraw-Hill Dictionary of Scientific & Technical Terms (6th ed. 2003) (definitions of "component" and "store") (UNICORN_00003259, (UNICORN_00003267-00003268).<br><br>Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report.<br><br>Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | **Extrinsic Evidence**<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "component": "1. A constituent part, especially of an organized whole or system. 2. Same as circuit component."<br><br>McGraw-Hill Dictionary of Electrical and Computer Engineering, 2004, definition of "component": "Any electric device, such as a coil, resistor, capacitor, generator, line, or electron tube, having distinct electrical characteristics and having terminals at which it may be connected to other components to form a circuit. Also known as circuit element; element."<br><br>Newton's Telecom Dictionary, 26th Edition, 2011, definition of "component": "An element of equipment which unto itself does not form a system."<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "distributed network": "A communications network in which resources, such as processors and switching equipment, are distributed throughout multiple locations, as opposed to one . . . . A computer network in which functions such as processing and storage are handled by multiple nodes, as opposed to a single computer."<br><br>Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto.<br><br>Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| "supply network" (claims 1, 27) | not indefinite;<br><br>"scalable collection of interconnected electrical devices for supplying consumers with electrical energy"<br><br>**Intrinsic Evidence**<br><br>Title, Abstract, Claims, 1:15-23, 3:20-21, 4:39-42, 4:54-5:7, 5:59-62, 6:2-5, 6:8-11, 6:31-36, 8:12-13, 10:26-28, 11:16-20, 11:25-32, 12:27-44<br><br>FIGs. 9-11, and related portions of the specification, including 18:3-39, 18:33-61, 19:2-14. | Indefinite;<br><br>alternatively, to the extent this term can be construed: "distributed network of physically contacting energy storing components"<br><br>**Intrinsic Evidence**<br><br>Claims.<br><br>'869 patent at 1:18-20, 3:39-30, 3:35-36, 5:3-5, 5:12-29, 5:61-6:13, 10:32-44, 13:50-60, 18:33-61; Figs. 1 and 10.<br><br>The '869 patent's file history, including at least the following: |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, July 21, 2017 Amendment and Response to Office Action. **Extrinsic Evidence** Comprehensive Dictionary of Electrical Engineering (2d ed. 2005) ("electrical network": "a collection of interconnected electrical devices") (UNICORN_00003228). Dictionary of Science & Technology (2d ed. 2003) ("supply": "the act or process of providing something that is needed · the supply of power to the building"; "network": "a system made up of a number of points or circuits that are interconnected") (UNICORN_00003249, UNICORN_00003250). Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report. Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | Amendment and Response Submitted with Request for Continued Examination of 3/5/2018. **Extrinsic Evidence** Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "network": "Its abbreviation is net. 1. A system of computers, transmission channels, and related resources which are interconnected to exchange information. A communications network may be comparatively small, in which case it can be a LAN, or relatively large, in which case it could be a WAN. A LAN may be confined, for instance to a single building, while a WAN may cover an entire country. The communications channels in a network may be temporary or permanent. Also called communications network, or telecommunications network. 2. One or more electric circuits incorporating two or more interconnected electrical elements or components, such as resistors, capacitors, coils or generators. There are various ways to classify electric networks. For instance, if a network incorporates active devices, such as amplifiers, it is an active network, while a passive network does not. A bilateral network is one which functions equally well in both directions, while a unilateral network does not. There are many examples of specific networks, and these include bridge, crossover, decoupling, and resistance- capacitance networks. Also called electric network. . . . 5. Any interconnected group or structure, especially when complex." Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "distributed network": "A communications network in which resources, such as processors and switching equipment, are distributed throughout multiple locations, as opposed to one . . . . A computer network in which functions such as processing and storage are handled by multiple nodes, as opposed to a single computer." Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto. Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| "network medium" (claims 1, 27) | "electrical energy in the supply network" **Intrinsic Evidence** | "electrical energy in a distributed network" **Intrinsic Evidence** Claims. |

8

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | Claims, 1:14-18, 4:52-53, 4:66-67, 5:3-5, 6:2-5, 7:49-54, 9:29-31, 9:61-63.<br><br>FIGs. 1, 9-11, and related portions of the specification, including 13:57-60, 14:1-22, 14:49-59, 19:28-29.<br><br>The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, July 21, 2017 Amendment and Response to Office Action.<br><br>**Extrinsic Evidence**<br><br>Dictionary of Science & Technology (2d ed. 2003) (definitions of "medium" and "network") (UNICORN_00003248, UNICORN_00003249).<br><br>Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report.<br><br>Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | '869 patent at 5:3-5, 5:27-30, 5:63-6:13, 13:50-60; Fig. 1.<br><br>The '869 patent's file history, including at least the following:<br><br>Amendment and Response Submitted with Request for Continued Examination of 3/5/2018.<br><br>**Extrinsic Evidence**<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "network": "Its abbreviation is net. 1. A system of computers, transmission channels, and related resources which are interconnected to exchange information. A communications network may be comparatively small, in which case it can be a LAN, or relatively large, in which case it could be a WAN. A LAN may be confined, for instance to a single building, while a WAN may cover an entire country. The communications channels in a network may be temporary or permanent. Also called communications network, or telecommunications network. 2. One or more electric circuits incorporating two or more interconnected electrical elements or components, such as resistors, capacitors, coils or generators. There are various ways to classify electric networks. For instance, if a network incorporates active devices, such as amplifiers, it is an active network, while a passive network does not. A bilateral network is one which functions equally well in both directions, while a unilateral network does not. There are many examples of specific networks, and these include bridge, crossover, decoupling, and resistance- capacitance networks. Also called electric network. . . . 5. Any interconnected group or structure, especially when complex."<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "medium": "1. The substance or entity through which something is transmitted, conveyed, carried, or the like. For example, a vacuum, a fluid, a plasma, or a solid. 2. A surrounding environment within which materials and entities exist, and within which phenomena, such as that of a physical or chemical nature, take place. For example, a vacuum, a fluid, a plasma, or a solid. 3. Any physical material or medium which serves to store or otherwise contain data. For instance, optical disks, magnetic tapes |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | | and disks, microfilm, and paper. Also called data medium, or storage medium."<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "distributed network": "A communications network in which resources, such as processors and switching equipment, are distributed throughout multiple locations, as opposed to one . . . . A computer network in which functions such as processing and storage are handled by multiple nodes, as opposed to a single computer."<br><br>Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto.<br><br>Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| "contact unit"<br>(claims 1, 3, 27)<br><br><br><br>"contact unit for contacting a further energy storing component"<br>(claims 1, 27) | not indefinite;<br><br>"connector that transmits electrical energy and/or information"<br><br>not indefinite;<br><br>not governed by § 112 ¶ 6; the term is described with sufficiently definite structure so that a person of ordinary skill in the art would be able to identify the structure from the description in the specification and claims.<br><br>no construction required after construing "contact unit" and "contacting"<br><br>**Corresponding Structure (only in the event the Court applies § 112 ¶ 6):** connectors/plugs/ sockets with electrical contacts and optionally including cables, as depicted and described at: Figs. 1-4, 6-10 (and related portions of the specification), 9:59-68, 10:19-25, 11:18-21, 12:36-37, 14:49-59, 16:9-15, 17:36-65, and the portions of the specification and figures identified in Unicorn's P.R. 4-2 disclosure. | **Invokes** 112 ¶ 6:<br><br>**Function**: "physically touching a further energy storing component to establish an electrical junction"<br><br>**Corresponding Structure**: "(1) the socket or the plug contact units 12 and 14, respectively, that implement the the standard interfaces 34, 36, 38 illustrated in FIGS. 7 and 8 for contacting a [further] contact unit, and (2) the single exterior contact units that physically touch other energy storing components, shown and described in Figures 1, 2, 3, 4, 6b, 7, 8, 10, and 11 and relevant portions of the specification, and equivalents thereof." *See* '869 patent at 5:27-29, 7:37-45, 7:46-48, 8:55-64, 9:8-21, 9:27-31, 9:34-10:44, 11:1-24, 12:1-5, 12:11-16, 12:52-57, 12:66-13:4, 13:50-55, 13:64-67, 14:9-22, 14:49-59, 15:13-23, 15:40-16:15, 16:29-47, 16:52-54, 17:4-56, 17:66-18:3, 18:23-25, 18:33-19:14; Figs. 1-4, 6b, 7-10, and 11.<br><br>Alternatively, if § 112 ¶ 6 is not invoked, this term is indefinite.<br><br>Alternatively, if § 112 ¶ 6 is not invoked, and this term is not indefinite, it should be construed as follows:<br><br>"contact unit": "a single part on the exterior surface with at least one contact" |
| "contacting"<br>(claims 1, 27)<br><br><br><br>"contacting a further energy storing component"<br>(claims 1, 27) | not indefinite;<br><br>"transmitting electrical energy and/or information from or to"<br><br>not indefinite;<br><br>no construction required after construing "contacting" | "contact unit for contacting a further energy storing component": "a single part on the exterior surface with at least one contact for physically touching another energy storing component to establish an |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | **Intrinsic Evidence**<br><br>Abstract, Claims, 2:66-3:7, 4:3-5:3, 5:25-29, 7:38-42, 7:46-48, 9:12-68, 9:58-68, 10:2-10, 10:19-31, 11:1-21, 12:11-16.<br><br>FIGs. 1-4, 6-10, and related portions of the specification, including 13:50-55, 14:15-22, 14:49-59, 15:13-23, 16:2-15, 17:36-51, 17:52-65.<br><br>The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, July 21, 2017 Amendment and Response to Office Action.<br><br>**Extrinsic Evidence**<br><br>Dictionary of Science & Technology (2d ed. 2003) ("contact": "4. ELEC a section of a switch or a connector that provides an electrical path when it touches another conductor"; definition of "unit") (UNICORN_00003237, UNICORN_00003253-00003254).<br><br>Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report.<br><br>Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | electrical junction"<br><br>"contacting": "physically touching a further energy storing component to establish an electrical junction"<br><br>**Intrinsic Evidence**<br><br>Claims.<br><br>'869 patent at 5:27-29, 7:37-45, 7:46-48, 8:55-64, 9:8-21, 9:27-31, 9:34-10:44, 11:1-24, 12:1-5, 12:11-16, 12:52-57, 12:66-13:4, 13:50-55, 13:64-67, 14:9-22, 14:49-59, 15:13-23, 15:40-16:15, 16:29-47, 16:52-54, 17:4-56, 17:66-18:3, 18:23-25, 18:33-19:14; Figs. 1-3, 4, 6b, 7-10, and 11.<br><br>The '869 patent's file history, including at least the following:<br><br>WO 2007/134320 (included in 10/30/2014 IDS in '869 patent's file history) ¶¶ 24, 82, Fig. 12.<br><br>EP 2343752 A2 (included in 10/30/2014 IDS in '869 patent's file history) ¶ 122, Figs. 23-25.<br><br>EP 2495802 A2 (included in 10/30/2014 IDS in '869 patent's file history) ¶ 104, Fig. 3.<br><br>Written Opinion of the International Searching Authority for PCT/EP2013/054194 (included in 10/30/2014 IDS in '869 patent's file history).<br><br>Requirement for Restriction/Election of 6/28/2016.<br><br>Response to Election/Restriction of 9/2/2016.<br><br>Non-final rejection of 1/24/2017.<br><br>Amendment and Response Submitted with Request for Continued Examination of 3/5/2018.<br><br>**Extrinsic Evidence**<br><br>Merriam-Webster Online Dictionary, definition of "contact" (https://www.merriam-webster.com/dictionary/contact (last visited 5/10/2021)): "union or junction of surfaces . . . the junction of two electrical conductors through which a current passes."<br><br>Dictionary.com, definition of "contact" (https://www.dictionary.com/ browse/contact (last visited 5/11/2021)): "the act or state of touching." |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | | Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "contact": "contact 1. The coming together, touching, union, or junction of surfaces or objects. 2. The junction of two conductors, so that current may flow. Also called electric contact (1). 3. A part or device which serves to open or close an electric circuit. Such a part or device may or may not act with another part or device. For instance, a blade, metal strip, button, switch, or relay. Also called electric contact (2)." |
| | | Newton's Telecom Dictionary, 26th Edition, 2011, definition of "contact": "A strip or piece of metal which makes an electrical contact when some electromechanical device like a relay or a magnet operates. Contacts are often plated with precious metal to prevent them from oxidizing (i.e. rusting) and thus messing up the switch. Contacts con be mole (pins) or female (sockets)." |
| | | IEEE 100 The Authoritative Dictionary of IEEE Standards Terms, 7th Edition, 2000, definition of "contact": "A conducting part that co-acts with another conducting part to make or break a circuit. (B) (of a relay). A conducting part that acts with another conducting part to make or break a circuit." |
| | | IEEE 100 The Authoritative Dictionary of IEEE Standards Terms, 7th Edition, 2000, definition of "contacts": "Conducting parts which co-act to complete or to interrupt a circuit. (2) (A) (nonoverlapping) Combinations of two sets of contacts, actuated by a common means, each set closing in one of two positions, and so arranged that the contacts of one set open before the contacts of the other set close." |
| | | Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "unit": "An item, group, structure, or entity which is regarded as a single entity or whole." |
| | | Cambridge Dictionary Online, definition of "unit" (https://dictionary.cambridge.org/ us/dictionary/english/unit (last visited 5/13/2021)): "a single thing or a separate part of something larger" |
| | | Merriam-Webster Online Dictionary, definition of "unit" (https://www.merriam-webster.com/dictionary/unit (last visited |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | | 5/10/2021)): "a single thing, person, or group that is a constituent of a whole." Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto. Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| "energy store" (claims 1, 27) | not indefinite; "unit that stores energy, such as a rechargeable battery" **Intrinsic Evidence** Claims, 1:21-43, 3:45-49, 5:3-11, 5:30-34, 5:63-64, 6:2-5, 6:39-48, 7:1-34, 8:28-41, 10:56-58, 11:16-40, 12:17-65. FIGs. 1-6, 9-11, and related portions of the specification, including 13:23-24, 13:61-64, 14:23-33, 15:28-31, 15:41-45, 16:20-24, 17:59-65, 18:43-61, 19:7-14. The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, July 21, 2017 Amendment and Response to Office Action. **Extrinsic Evidence** Dictionary of Science & Technology (2d ed. 2003) (definition of "energy") (UNICORN_00003241-00003242). McGraw-Hill Dictionary of Scientific & Technical Terms (6th ed. 2003) (definition of "store") (UNICORN_00003267-00003268). Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report. Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | Indefinite; **Intrinsic Evidence** Claims. '869 patent at 1:18-20, 4:43-5:29, 5:17-25, 5:63-6:13, 8:28-42, 8:55-57, 11:33-35, 12:17-22, 13:50-21:12; Fig. 2. The '869 patent's file history, including at least the following: Amendment and Response Submitted with Request for Continued Examination of 3/5/2018. **Extrinsic Evidence** Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto. Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction. |
| "gateway" (claims 1, 2, 3, 27) "gateway for coupling the at least one contact unit | not indefinite; "coupling unit (i.e., coupler) that transfers electrical energy" not indefinite; | **Invokes** 112 ¶ 6: **Function**: coupling the at least one contact unit with the energy store **Corresponding Structure**: none disclosed/indefinite; alternatively, to the extent |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| with the energy store" (claims 1, 27) | not governed by § 112 ¶ 6; the term is described with sufficiently definite structure so that a person of ordinary skill in the art would be able to identify the structure from the description in the specification and claims.<br><br>no construction required after construing "gateway"<br><br>**Corresponding Structure (only in the event the Court applies § 112 ¶ 6):** coupling unit/coupler that that establishes an energy transfer path between the "contact unit" and the "energy store," including a DC/DC converter (79) and optionally including a controlling device (26), as depicted and described at: Figs. 1, 9, 10 (and related portions of the specification), 6:66-67, 13:64-67, 14:23-38, 17:67-18:3, and the portions of the specification and figures identified in Unicorn's P.R. 4-2 disclosure.<br><br>**Intrinsic Evidence**<br><br>Abstract, Claims, 3:31, 4:43-5:2, 6:65-7:5, 8:4-13.<br><br>FIGs. 1, 9, 10, and related portions of the specification, including 13:62-68, 14:15-32, 17:66-18:22, 18:33-53.<br><br>The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, July 21, 2017 Amendment and Response to Office Action.<br><br>**Extrinsic Evidence**<br><br>Collins Dictionary (10th ed. 2009) (definitions of "coupler" and "gateway"; "coupling": "4 *electronics* the act or process of linking two or more circuits so that power can be transferred between them usually by mutual induction, as in a transformer, or by means of a capacitor or inductor common to both circuits") (UNICORN_00003224-00003225).<br><br>Dictionary of Science & Technology (2d ed. 2003) (definitions of "unit" and "gateway") (UNICORN_00003244, UNICORN_00003253-00003254).<br><br>McGraw-Hill Dictionary of Scientific & Technical Terms (6th ed. 2003) (definitions of "coupler," and "gateway"; "coupling": "A mutual relation | these terms can be construed: "the coupling unit 18 shown in Figs. 1, 9, and 10 and described in related portions of the specification." *See* '869 patent at 6:65-67, 7:38-42, 13:50-67, 14:8-28, 17:66-18:13, 18:33-61; Figs. 1, 9, 10.<br><br>Alternatively, if § 112 ¶ 6 is not invoked, this term is indefinite.<br><br>Alternatively, if § 112 ¶ 6 is not invoked, and this term is not indefinite, it should be construed as follows:<br><br>"gateway": "a single part that serves as a point of entry and exit to another system"<br><br>"gateway for coupling the at least one contact unit with the energy store": "a single part that serves as a point of entry and exit to another system for coupling the at least one contact unit with the energy store"<br><br>**Intrinsic Evidence**<br><br>Claims.<br><br>'869 patent at 6:65-67, 7:38-42, 13:50-67, 14:8-28, 17:66-18:13, 18:33-61; Figs. 1, 9, 10.<br><br>The '869 patent's file history, including at least the following:<br><br>Written Opinion of the International Searching Authority for PCT/EP2013/054194 (included in 10/30/2014 IDS in '869 patent's file history).<br><br>Amendment and Response Submitted with Request for Continued Examination of 3/5/2018.<br><br>**Extrinsic Evidence**<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "gateway": 1. A device which enables networks to connect by performing the necessary protocol conversions. For example, a gateway could carry out the translation between T1 and E1, between Ethernet and Token Ring, or between messaging protocols. 2. In a communications network, or multiple interconnected networks, a device or software which determines where packets, messages, or other signals travel to next. A gateway, using resources such as header information, algorithms, and router tables, establishes the best available |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | between two circuits that permits energy transfer from one to another, through a wire, resistor, transformer, capacitor or other device") (UNICORN_00003260, UNICORN_00003264).

Patent Publication DE 102006043831A1

Patent Publication US 2007/0188130 A1

Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report.

Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | path from source to destination. Within the OSI Reference Model, a gateway operates at the network layer. Also called router, or network router."

McGraw-Hill Dictionary of Electrical and Computer Engineering, 2004, definition of "gateway": "A point of entry and exit to another system, such as the connection point between a local-area network and an external-communications network."

Newton's Telecom Dictionary, 26th Edition, 2011, definition of "gateway": "A gateway is what it sounds like. It's an entrance and exit into a communications network. That 'communications network' may be huge, for example, at the point where AT&T Communications ends and Comsat begins—for taking my satellite call overseas. Gateways may be small--between one LAN and another LAN. Technically, a gateway is an electronic repeater and signal regeneration device that intercepts and steers electrical signals from one network to another. Generally, the gateway includes a signal conditioner which filters out unwanted noise and controls characters. In data networks, gateways are typically a node on both two networks that connects two otherwise incompatible networks. For example, PC users on a local area network may need a gateway to gain access to a mainframe computer since the mainframe does not speak the same language (protocols) as the PCs on the LAN. Thus, gateways on data networks often perform code and protocol conversion processes. Gateways also eliminate duplicate wiring by giving all users on the network access to the mainframe without each having a direct, hard-wired connection. Gateways also connect compatible networks owned by different entities, such as X.25 networks linked by X.75 gateways. Gateways are commonly used to connect people on one network, say a token ring network, with those on a long distance network. According to the OSI model, a gateway is a device that provides mapping of all seven layers of the model. A gateway may be used to interface between two incompatible electronic mail systems or for transferring data files from one system to another."

Oxford Dictionary of Computing, 2008, definition of "gateway": "A device that interconnects two *networks, and whose presence is usually visible to network users (as distinct from a *bridge, whose |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | | presence is generally not visible). A gateway may be required to deal with one or more of the following differences between networks it connects:<br><br>(a) change of addressing *domain – where the networks have addressing domains managed by separate groups, a gateway may be used to handle address transformations for messages traversing the gateway;<br><br>(b) control of charging – where the networks have different approaches to charging (e.g. a local area network that imposes no charges connecting to a wide area network that charges on a per-packet basis), a gateway may be used to handle user authorization and usage accounting;<br><br>(c) change of protocol – where the networks use different protocols, a gateway may be used to carry out necessary protocol conversion (if practicable) or to intercept attempts by a user on one network to use functions no available on the other and to supply suitable responses.<br><br>The terms bridge, gateway, and *relay are among those whose meanings vary between different communities of users at a given time, and within a given community of users at different times."<br><br>IEEE 100 The Authoritative Dictionary of IEEE Standards Terms, 7th Edition, 2000, definition of "gateway": "A functional unit that interconnects a local area network (LAN) with another network having different higher layer protocols. (2) (A) A dedicated computer that attaches to two or more networks and routes packets from one to the other. (B) In networking, a device that connects two systems that use different protocols."<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "unit": "An item, group, structure, or entity which is regarded as a single entity or whole."<br><br>Cambridge Dictionary Online, definition of "unit" (https://dictionary.cambridge.org/ us/dictionary/english/unit (last visited 5/13/2021)): "a single thing or a separate part of something larger."<br><br>Merriam-Webster Online Dictionary, definition of "unit" (https://www.merriam-webster.com/dictionary/unit (last visited |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | | 5/10/2021)): "a single thing, person, or group that is a constituent of a whole." |
| | | Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto. |
| | | Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| "**communication interface** for communicating with a further energy storing component" (claims 1, 27) | not governed by § 112 ¶ 6; the term is described with sufficiently definite structure so that a person of ordinary skill in the art would be able to identify the structure from the description in the specification and claims. "communication interface" = "component(s) that electronically exchanges information" no construction required after construing "communication interface" **Corresponding Structure (only in the event the Court applies § 112 ¶ 6):** wired communications over electrical contacts and data network/mesh (20) or wireless communications (including capacitive, inductive, optical or RFID), as depicted and described in Figs. 1, 9, 10 (and related portions of the specification), 2:66-3:2, 9:8-11, 10:26-42, 14:5-9, 15:14-24, 16:37-45, 17:33-34, and the portions of the specification and figures identified in Unicorn's P.R. 4-2 disclosure. **Intrinsic Evidence** Abstract, Claims, 2:66-3:2, 4:43-5:2, 8:55-9:11, 9:51-54, 10:26-42, 12:1-5, 12:66-13:7. FIGs. 1, 3, 9, 10 and related portions of the specification, including 15:14-21, 16:37-47. The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, July 21, 2017 Amendment and Response to Office Action. **Extrinsic Evidence** Dictionary of Science & Technology (2d ed. 2003) (definition of "communicate"; "interface": "a circuit, device or port that allows two or more incompatible units to be linked together in a standard communication system, allowing data to be transferred between them") (UNICORN_00003232, UNICORN_00003247). | **Invokes 112 ¶ 6:** **Function:** "exchanging information with a further energy storing component capable of understanding the information" **Corresponding Structure:** "an RFID transponder for transmitting and receiving all required technical data and physical parameters between energy storing components, and equivalents thereof." *See* '869 patent at 8:55-64, 9:8-11, 10:26-31, 12:1-5, 12:66-13:4, 14:49-51, 15:13-23, 16:37-47, 17:31-35, 18:33-61; Figs. 1, 3, 8, 10. Alternatively, if § 112 ¶ 6 is not invoked: "a point at which two energy storing components interact for exchanging understandable information" **Intrinsic Evidence** Claims. '869 patent at 5:17-25, 8:55-64, 9:8-11, 10:26-49, 11:41-49, 12:1-5, 12:66-13:4, 14:11-12, 14:33-48, 14:49-51, 14:55-59, 15:13-23, 16:1-5, 16:37-47, 17:31-35, 18:33-61; Figs. 1, 3, 8, 9, 10. The '869 patent's file history, including at least the following: Amendment and Response After Non-Final Rejection of 7/21/2017. Amendment and Response Submitted with Request for Continued Examination of 3/5/2018. Written Opinion of the International Searching Authority for PCT/EP2013/054194 (included in 10/30/2014 IDS in '869 patent's file history). **Extrinsic Evidence** IEEE 100 The Authoritative Dictionary of IEEE Standards Terms, 7th Edition, 2000, definition of "communication interface": "That part of the API devoted to communications with other application |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | McGraw-Hill Dictionary of Scientific & Technical Terms (6th ed. 2003) (definition of "interface") (UNICORN_00003266).<br><br>Modern Dictionary of Electronics (7th ed. 1999) (communication": "1. The transmission of information from one point, person, or equipment to another"; definition of "interface") (UNICORN_00003282-00003283).<br><br>Patent Publication US 2010/0141202 A1<br><br>Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report.<br><br>Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | software, external data transport facilities, and devices."<br><br>Comprehensive Dictionary of Electrical Engineering, 1999, definition of "interface": "the set of rules specified for communicating with a defined entity."<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "interface": "1. The point or points where two entities meet. For instance, the connection between devices exchanging information, the boundary between two phases of matter such as that between an electrode and an electrolyte, or between semiconductor regions. 2. A device which serves to connect a computer to peripheral devices or a network. Such interfaces include SCSI, RS-232, and network adapters. Also called computer interface (2). 3. Any interface (1) used in association with a computer, such as those between programs, between hardware and software, between hardware and a user, or between software and a user. Also called computer interface (3)."<br><br>McGraw-Hill Dictionary of Electrical and Computer Engineering, 2004, definition of "interface": "1. Some form of electronic device that enables one piece of gear to communicate with or control another. 2. A device linking two otherwise incompatible devices, such as an editing terminal of one manufacturer to typesetter of another."<br><br>Newton's Telecom Dictionary, 26th Edition, 2011, definition of "interface": "l. Noun. A mechanical or electrical link connecting two or more pieces of equipment together. 2. Noun. A shared boundary. A physical point of demarcation between two devices where the electrical signals, connectors, timing and handshaking are defined. The procedures, codes and protocols that enable two entities to interact for a meaningful exchange of information. 3. A system's attachment point to a link."<br><br>Merriam-Webster Online Dictionary, definition of "interface" (https://www.merriam-webster.com/dictionary/interface (last visited May 10, 2021): ": the place at which independent and often unrelated systems meet and act on or communicate with each other. b: the means by which interaction or communication is achieved at |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | | an interface. : a surface forming a common boundary of two bodies, spaces, or phases." |
| | | Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "communication": "Also called communications (2), or telecommunication. 1. The transmission of information between two or more points or entities. This includes the equipment, modes, mechanisms, and media used for this purpose. 2. The information conveyed via communication (1). 3. The use of electrical, electronic, electromagnetic, optical, or acoustic means to transmit information between two or more points. Also, the conveyed information." |
| | | IEEE 100 The Authoritative Dictionary of IEEE Standards Terms, 7th Edition, 2000, definition of "communication": "The flow of information from one point, known as the source, to another, the receive." |
| | | Merriam-Webster Online Dictionary, definition of "communication" (https://www.merriam-webster.com/dictionary/ communication (last visited May 10, 2021): "a process by which information is exchanged between individuals through a common system of symbols, signs, or behavior" |
| | | Merriam-Webster Online Dictionary, definition of "communications" (https://www.merriam-webster.com/dictionary/ communication (last visited May 10, 2021): "a system (as of telephones or computers) for transmitting or exchanging information" |
| | | Merriam-Webster Online Dictionary, definition of "communicate" (https://www.merriam-webster.com/dictionary/ communicate (last visited May 10, 2021): "to transmit information, thought, or feeling so that it is satisfactorily received or understood" |
| | | Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto. |
| | | Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| "**transport interface** for transporting the electrical energy to the further energy storing component" | not governed by § 112 ¶ 6; the term is described with sufficiently definite structure so that a person of ordinary skill in the art would be able to identify the structure from the description in the specification and claims. | **Invokes 112 ¶ 6:**<br><br>**Function**: "transmitting the electrical energy to the further energy storing component" |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| (claims 1, 5, 27) | "transport interface" = "electrical contact"<br><br>no construction required after construing "transport interface"<br><br>**Corresponding Structure (only in the event the Court applies § 112 ¶ 6):** electrical contacts as depicted and described in Figs. 1-3, 7-10 (and related portions of the specification), 9:50-67, 10:7-10, 14:49-54, 15:13-14, 16:2-15, 17:36-65, and the portions of the specification and figures identified in Unicorn's P.R. 4-2 disclosure.<br><br>**Intrinsic Evidence**<br><br>Abstract, Claims, 4:43-5:3, 6:2-5, 7:46-48, 9:29-31, 9:51-10:21, 11:16-22.<br><br>FIGs. 1-3, 7-10, and related portions of the specification, including 14:51-54, 15: 13-16, 16:5-13, 17:44-63.<br><br>The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, July 21, 2017 Amendment and Response to Office Action.<br><br>**Extrinsic Evidence**<br><br>Dictionary of Science & Technology (2d ed. 2003) (definition of "interface"; "transport": "1. a system of moving things from one place to another") (UNICORN_00003247, UNICORN_00003252).<br><br>McGraw-Hill Dictionary of Scientific & Technical Terms (6th ed. 2003) ("interface": "[SCI TECH] A shared boundary; it may be a piece of hardware used between two pieces of equipment"; definition of "transport") (UNICORN_00003266, UNICORN_00003271).<br><br>Modern Dictionary of Electronics (7th ed. 1999) ("interface": "2. The two surfaces on the contact sides of mating connectors that face each other when mated. 3. A common boundary between two or mor items. May be mechanical, electrical, functional or contractual") (UNICORN_00003283).<br><br>Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert | **Corresponding Structure**: "a rotationally symmetrical structure designed in a coaxial fashion with respect to an auxiliary voltage interface, consisting of either spring contact pins or two ring-shaped, coaxial contacts—one for ground and potentially comprising insulating webs, as described in the specification, and equivalents thereof." *See* '869 patent at 7:46-48, 9:27-31, 9:50-10:21, 14:51-54, 15:13-23, 16:5-15, 17:4-51, 18:33-61; Figs 1, 2, 3, 7, 8, 10.<br><br>Alternatively, if § 112 ¶ 6 is not invoked: "a point at which two energy storing components contact for transmitting electrical energy"<br><br>**Intrinsic Evidence**<br><br>Claims.<br><br>'869 patent at 7:46-48, 9:27-31, 9:50-10:21, 14:51-54, 15:13-23, 15:41-16:15, 17:4-51, 18:33-61; Figs 1, 2, 3, 7, 8, 9, 10.<br><br>The '869 patent's file history, including at least the following:<br><br>Written Opinion of the International Searching Authority for PCT/EP2013/054194 (included in 10/30/2014 IDS in '869 patent's file history).<br><br>**Extrinsic Evidence**<br><br>McGraw-Hill Dictionary of Electrical and Computer Engineering, 2004, definition of "transport": "1. To convey as a whole from one storage device to another in a digital computer."<br><br>Comprehensive Dictionary of Electrical Engineering, 1999, definition of "interface": "the set of rules specified for communicating with a defined entity."<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "interface": "1. The point or points where two entities meet. For instance, the connection between devices exchanging information, the boundary between two phases of matter such as that between an electrode and an electrolyte, or between semiconductor regions. 2. A device which serves to connect a computer to peripheral devices or a network. Such interfaces include SCSI, RS-232, and network adapters. Also called computer interface (2). 3. Any interface (1) used in |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | Report.<br><br>Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | association with a computer, such as those between programs, between hardware and software, between hardware and a user, or between software and a user. Also called computer interface (3)."<br><br>McGraw-Hill Dictionary of Electrical and Computer Engineering, 2004, definition of "interface": "1. Some form of electronic device that enables one piece of gear to communicate with or control another. 2. A device linking two otherwise incompatible devices, such as an editing terminal of one manufacturer to typesetter of another."<br><br>Newton's Telecom Dictionary, 26th Edition, 2011, definition of "interface": "l. Noun. A mechanical or electrical link connecting two or more pieces of equipment together. 2. Noun. A shared boundary. A physical point of demarcation between two devices where the electrical signals, connectors, timing and handshaking are defined. The procedures, codes and protocols that enable two entities to interact for a meaningful exchange of information. 3. A system's attachment point to a link."<br><br>Merriam-Webster Online Dictionary, definition of "interface" (https://www.merriam-webster.com/dictionary/interface (last visited May 10, 2021): ": the place at which independent and often unrelated systems meet and act on or communicate with each other. b: the means by which interaction or communication is achieved at an interface. : a surface forming a common boundary of two bodies, spaces, or phases."<br><br>Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto.<br><br>Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| "configured to cooperate with the communication interface" (claims 1, 27) | not indefinite;<br><br>"able to obtain information from the communication interface"<br><br>**Intrinsic Evidence**<br><br>Claims, 8:55–64, 9:8-11, 12:1-5.<br><br>The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, | Indefinite;<br><br>alternatively, to the extent this term can be construed: "configured to work together with the communication interface"<br><br>**Intrinsic Evidence**<br><br>Claims.<br><br>'869 patent at 2:13-28, 8:48-51, 12:1-5. |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | July 21, 2017 Amendment and Response to Office Action. **Extrinsic Evidence** Dictionary of Science & Technology (2d ed. 2003) (definition of "configure") (UNICORN_00003236). Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report. Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | The '869 patent's file history, including at least the following: Amendment and Response After Non-Final Rejection of 7/21/2017. Amendment and Response Submitted with Request for Continued Examination of 3/5/2018. **Extrinsic Evidence** Merriam-Webster Online Dictionary, definition of "cooperate" (https://www.merriam-webster.com/dictionary/cooperate (last visited May 10, 2021): "1: to act or work with another or others : act together or in compliance. 2: to associate with another or others for mutual benefit." Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto. Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| **"an autonomous identification of incompatibility** of the energy storing component with the present supply network" / **"an autonomous identification of incompatibility** of the respective energy storing component with the present supply network" (claims 1, 27) | not indefinite; "an autonomous identification of incompatibility" = "the energy storing component monitoring communications with one or more other devices on the supply network and physical parameters of the supply network to self-determine, using at least information derived from such communications, whether to separate from the network medium" no construction required after construing "an autonomous identification of incompatibility" | Indefinite; alternatively, to the extent these terms can be construed: "an identification, by the energy storing component, of incompatibility with the supply network" |
| **"an autonomous identification of compatibility** of the respective energy storing component with the present supply network" (claim 28) | not indefinite; "an autonomous identification of compatibility" = "the energy storing component monitoring communications with one or more other devices on the supply network and physical parameters of the supply network to self-determine, using at least information derived from such communications, whether to connect itself to the network medium" no construction required after construing "an autonomous identification of compatibility" **Intrinsic Evidence** Claims, 5:25-29, 8:4-7, 8:48-9:33, 12:1-5, | Indefinite; alternatively, to the extent these terms can be construed: "an identification, by the energy storing component, of compatibility with the supply network" **Intrinsic Evidence** Claims. '869 patent at 8:48-64, 14:1-23; Fig. 1. The '869 patent's file history, including at least the following: |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | FIGs. 1, 9, 10, and related portions of the specification, including 14:12-22, 18:28-32.<br><br>The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, July 21, 2017 Amendment and Response to Office Action.<br><br>**Extrinsic Evidence**<br><br>Dictionary of Science & Technology (2d ed. 2003) ("compatibility": "the ability of two hardware or software devices to function together"; definitions of "compatible," "identification," and "incompatibility") (UNICORN_00003233, UNICORN_00003245, UNICORN_00003246).<br><br>McGraw-Hill Dictionary of Scientific & Technical Terms (6th ed. 2003) (definitions of "compatibility" and "identification") (UNICORN_00003258, UNICORN_00003265).<br><br>New Oxford American Dictionary (3d ed. 2010) ("autonomous": "acting independently or having the ability to do so") (UNICORN_00003276).<br><br>Webster's Third New International Dictionary of the English Language (Unabridged 2002) (definition of "autonomous") (UNICORN_00003279).<br><br>Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report.<br><br>Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | Amendment and Response After Non-Final Rejection of 7/21/2017.<br><br>Amendment and Response Submitted with Request for Continued Examination of 3/5/2018.<br><br>**Extrinsic Evidence**<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "compatibility": 1. The ability of two or more computer systems or components to work together seamlessly, without modification. This also extends to programs and shared files. For instance, a printer that works essentially flawlessly with a given computer, or a program that works equally well across multiple platforms. 2. The extent to which compatibility (1) is achieved. 3. The ability of two or more components, devices, pieces of equipment, or systems to work properly together, without modification . 4. The extent to which compatibility (3) is achieved."<br><br>McGraw-Hill Dictionary of Electrical and Computer Engineering, 2004, definition of "compatibility": "The ability of one device to accept data handled by another device without conversion of the data or modification of the code."<br><br>Newton's Telecom Dictionary, 26th Edition, 2011, definition of "compatible": "A widely misused and especially vague word, 'compatible' has several meanings. Hardware or software systems or components that are capable of working together in harmony (i.e. interoperating smoothly) can be characterized as compatible. The same goes for a product that is deemed by someone (usually a marketing type or a salesperson) to be equivalent to a better known product, as in 'IBM-compatible.' That means that that product can be used interchangeably. Hardware or software systems or components that fulfill the basic specifications defined in a formal standard are said to be compatible with that standard. In the computer world, two computers are said to be compatible when they will produce the identical result if they run identical programs. Being 'compatible' doesn't always assure that the compatible thing will work."<br><br>Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto. |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | | Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| "controlling device" (claims 2, 24) | "microcontroller or other programmable circuit" **Intrinsic Evidence** Claims, 6:65-67, 7:1-45, 8:1-16, 10:22-25, 12:1-5, 12:65-13:4. FIGs. 1, 3, 9, 10 and related portions of the specification, including 13:65-66, 14:23-32, 14:45-48, 14:60-15:5, 16:40-42. The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, July 21, 2017 Amendment and Response to Office Action. **Extrinsic Evidence** Dictionary of Science & Technology (2d ed. 2003) (definitions of "control" and "device") (UNICORN_00003238-00003239, UNICORN_00003240). McGraw-Hill Dictionary of Scientific & Technical Terms (6th ed. 2003) (definition of "device") (UNICORN_00003262). Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report. Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | Plain and ordinary meaning; no construction necessary **Intrinsic Evidence** Claims. '869 patent at 6:65-7:37, 9:4-8, 12:1-5, 12:66-13:7, 14:23-48, 14:60-15:5, 16:37-42; Figs. 1 and 3. The '869 patent's file history **Extrinsic Evidence** Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto. Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| "**auxiliary voltage interface** for transmitting an auxiliary voltage for supplying at least one of the contact unit or the gateway with electrical energy" (claim 3) | not governed by § 112 ¶ 6; the term is described with sufficiently definite structure so that a person of ordinary skill in the art would be able to identify the structure from the description in the specification and claims. "auxiliary voltage interface" = "electrical contact for transmitting auxiliary electrical energy" no construction required after construing "auxiliary voltage interface" **Corresponding Structure (only in the event the Court applies § 112 ¶ 6):** electrical contacts as depicted and described in Figs. 1-3, 7-10 (and related portions of the specification), 10:21-25, 14:8-18, 14:55-59, 15:13-14, 16:2-15, 17:36-65, | **Invokes** 112 ¶ 6: **Function**: "transmitting auxiliary voltage for supplying at least one of the contact unit or the gateway with electrical energy" **Structure**: "a rotationally symmetrical structure designed in a coaxial fashion with respect to the transport interface in the form of either a centrally-formed spring contact at 12 V and up to 2 A or a mating contact." *See* '869 patent at 7:37-45, 10:19-24, 14:9-22, 14:55-59, 15:13-23, 15:66-16:14, 17:36-43, 17:66-18:3, 18:23-25, 18:33-61; Figs. 1-3, 7-10. Alternatively, if § 112 ¶ 6 is not invoked: "a point at which two energy storing components meet for |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | and the portions of the specification and figures identified in Unicorn's P.R. 4-2 disclosure. | transmitting auxiliary electrical energy with each other" |
| | **Intrinsic Evidence** | **Intrinsic Evidence** |
| | Claims, 7:38-45, 10:19-25. | Claims. |
| | FIGs. 1-3, 7-10, and related portions of the specification, including 14:8-22, 14:55-59, 15:13-23, 16:1-5, 17:36-63, 17:66-18:3, 18:22-25. | '869 patent at 7:37-45, 10:19-24, 14:9-22, 14:55-59, 15:13-23, 15:66-16:14, 17:36-43, 17:66-18:3, 18:23-25, 18:33-61; Figs. 1-3, 7-10. |
| | The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, July 21, 2017 Amendment and Response to Office Action. | The '869 patent's file history |
| | **Extrinsic Evidence** | **Extrinsic Evidence** |
| | Dictionary of Science & Technology (2d ed. 2003) (definitions of "auxiliary," "interface," and "voltage") (UNICORN_00003231, UNICORN_00003247, UNICORN_00003255). | Newton's Telecom Dictionary, 26th Edition, 2011, definition of "auxiliary power": "An alternate source of electric power, serving as backup for the primary power at the station main bus or prescribed sub-bus. An off-line unit provides electrical isolation between the primary power and the critical technical load; an online unit does not." |
| | McGraw-Hill Dictionary of Scientific & Technical Terms (6th ed. 2003) (definitions of "interface" and "voltage") (UNICORN_00003266, UNICORN_00003272). | Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto. |
| | Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report. | Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| | Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | |
| "functional group" (claim 9) | not indefinite; | Indefinite; |
| | "energy store" | **Intrinsic Evidence** |
| | **Intrinsic Evidence** | Claims. |
| | Abstract, Claims, 4:43-5:3, 6:65-7:5, 7:55-57, 8:1-3, 8:38-51, 8:65-9:3, 9:34-37, 12:1-5, 20:65-21:12. | '869 patent at 6:65-7:5, 7:55-57, 8:1-3, 8:38-51, 8:65-9:3, 9:34-49, 12:1-5, 13:61-67, 14:23-32, 14:60-15:12, 15:41-16:14, 16:20-36, 16:63-17:34, 17:59-18:3, 18:14-61; Figs. 1-5, 6a, 6b, 8-10. |
| | FIGs. 1-3, 5-10, and related portions of the specification, including 13:41-42, 13:61-64, 14:23-32, 14:60-15:12, 15:41-16:15, 16:20-36, 16:63-17:13, 17:59-18:3, 18:14-61. | The '869 patent's file history, including at least the following: |
| | The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, | Amendment and Response Submitted with Request for Continued Examination of 3/5/2018. |
| | | **Extrinsic Evidence** |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | July 21, 2017 Amendment and Response to Office Action.<br><br>**Extrinsic Evidence**<br><br>Dictionary of Science & Technology (2d ed. 2003) (definition of "functional") (UNICORN_00003243).<br><br>Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report.<br><br>Any intrinsic/extrinsic evidence that Tesla may rely upon in support of its construction(s). | Newton's Telecom Dictionary, 26th Edition, 2011, definition of "functional group": "A collection of FEs (Functional Entities) that reside together in a system."<br><br>Newton's Telecom Dictionary, 26th Edition, 2011, definition of "functional entity": "A set of functions that provides one or more specified capabilities."<br><br>Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto.<br><br>Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |
| "supply network component" (claim 27) | not indefinite;<br><br>"energy storing component for a supply network"<br><br>**Intrinsic Evidence**<br><br>Title, Abstract, Claims, 1:14-20, 1:23-31, 5:17-25, 5:30-34, 5:50-52, 5:63-6:3, 6:27-30, 8:55-57, 10:26-28, 11:17-36, 11:49-52, 12:25-31, 12:36-37, 12:45-48, 12:55-61, 13:61-64.<br><br>FIGs. 1-3, 5, 7, 10, 11, and related portions of the specification, including 13:23-24, 13:61-64, 16:21-24, 16:61-66, 18:37-61, 18:64-67.<br><br>The prosecution history, including March 5, 2018 Amendment and Response to Final Office Action filed with Request for Continued Examination, July 21, 2017 Amendment and Response to Office Action.<br><br>**Extrinsic Evidence**<br><br>Dictionary of Science & Technology (2d ed. 2003) (definitions of "component," "network," and "supply") (UNICORN_00003234-00003235, UNICORN_00003249, UNICORN_00003250).<br><br>McGraw-Hill Dictionary of Scientific & Technical Terms (6th ed. 2003) (definition of "component") (UNICORN_00003259).<br><br>Testimony/Expert Report from Mr. Brian K. Dillard, including all additional documents and information cited in his June 4, 2021 Expert Report.<br><br>Any intrinsic/extrinsic evidence that Tesla may | Indefinite;<br><br>**Intrinsic Evidence**<br><br>Claims.<br><br>'869 patent at 1:18-20, 3:39-30, 3:35-36, 4:43-5:29, 5:17-29, 5:63-6:13, 8:28-42, 8:55-57, 10:32-44, 11:33-35, 12:17-22, 13:50-21:12; Fig. 2.<br><br>The '869 patent's file history, including at least the following:<br><br>Written Opinion of the International Searching Authority for PCT/EP2013/054194 (included in 10/30/2014 IDS in '869 patent's file history).<br><br>Amendment and Response Submitted with Request for Continued Examination of 3/5/2018.<br><br>**Extrinsic Evidence**<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "supply": "1. To make something available for use, to equip, or to provide sufficiently for. Also, that which is supplied, or is available for supplying. Also, such an act of supplying. 2. A source of power or electricity. For example, a power line or battery. Also called power supply (1). 3. A source of power for electronic components, circuits, devices, equipment, or systems. Such sources include batteries and power packs. Also called electronic power supply, or power supply (2)."<br><br>Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "component": "1. |

| Claim Term, Phrase, or Clause (Claim No.)[1] | Unicorn's Proposed Construction and Evidence | Tesla's Proposed Construction and Evidence |
|---|---|---|
| | rely upon in support of its construction(s). | A constituent part, especially of an organized whole or system." |
| | | McGraw-Hill Dictionary of Electrical and Computer Engineering, 2004, definition of "component": "Any electric device, such as a coil, resistor, capacitor, generator, line, or electron tube, having distinct electrical characteristics and having terminals at which it may be connected to other components to form a circuit." |
| | | Newton's Telecom Dictionary, 26th Edition, 2011, definition of "component": "An element of equipment which unto itself does not form a system." |
| | | Wiley Electrical and Electronics Engineering Dictionary, 2004, definition of "distributed network": "A communications network in which resources, such as processors and switching equipment, are distributed throughout multiple locations, as opposed to one . . . . A computer network in which functions such as processing and storage are handled by multiple nodes, as opposed to a single computer." |
| | | Declaration of Dr. Mark Ehsani and all evidence and exhibits cited and/or attached thereto. |
| | | Any intrinsic/extrinsic evidence that Unicorn may rely upon in support of its construction(s). |